O’NIELL, Chief Justice.
 

 This is a suit for damages for an alleged breach of a contract of lease. The lessee sued for $33,529.45 damages, and obtained judgment for $3,500. The defendant, lessor, has appealed. The plaintiff, answering the appeal, asks for an increase in the amount of the judgment to the amount sued for.
 

 In August, 1930, the defendant, New Orleans Public Service, Inc., leased to the plaintiff, Modern Amusements, Inc., a park, called Kempster Park, for the year beginning on the 1st day of September, 1930, and ending on the 31st day of August, 1931, for the conducting of baseball games, to be played at night. The games were permitted from sundown to midnight, on any or every night except on nights when classes would be held in a nearby high school. It is admitted that it was not contemplated by either the lessor or the lessee that baseball would be played in the park by negroes. And in fact the only games that were played in the park were by white players, except on the night of the 17th of July, 1931. On that night a game was played between two negro teams, under an arrangement between the lessee of the park and a negro, baseball promotor. During the game one of the players had a fight with the umpire and knocked him down, causing a disturbance, which was quelled by a police officer. An employee of the Public Service, Inc., informed the vice president of the corporation of the negro game which had been staged, and of the. disturbance which had called for the services of the police officer. The vice president took the matter
 
 *901
 
 up with the president of the Public Service, Inc., and, considering that the location of the park was in a neighborhood of residences occupied — almost exclusively— by white families, the president of the corporation availed himself of a clause in the lease which allowed the corporation to prescribe rules and regulations for the use of the park, and he instructed the vice president to notify the Modern Amusements, Inc., that the park should not be let to negroes. Accordingly, the vice president of the Public Service, Inc., notified the Modern Amusements, Inc., in writing, on the 24th of July, 1931, thus:
 

 “It has been brought to our attention that you have allowed Kempster Park to be used by negroes to play baseball at night. Paragraph 3, on page 2, of our agreement with you reads as follows:
 

 “ ‘Lessee covenants to operate business in a manner that will not be objectionable or offensive.’
 

 “The practice of letting the park to negroes is both objectionable and offensive to us, and, as we have reserved the right in the lease with you to prescribe such rules and regulations in the operation of Kempster Park as may be necessary, we hereby notify you that you must not let the park to negroes for any purpose.”
 

 When the manager received this letter, on the 24th day of July, 1932, he had already booked and advertised another negro baseball game to be played that night. On the advice of the attorney for the Modern Amusements, Inc., the manager canceled the game; and the attorney wrote a letter of protest to the New Orleans Public Service, Inc., saying that there was no stipulation in the contract of lease to justify the lessor in forbidding the playing of negro baseball games in the park. The most pertinent part of the protest was stated thus:
 

 “This is to inform you that in accordance with your request my clients are going to call off a negro baseball game which was scheduled to be held tonight, July 24th, 1931, at 8:00 o’clock, and that we will hold your organization to the strict letter of our contract, and that is, that any damages which will be sustained as the result of this arbitrary, uncalled-for, unjust and unauthorized action of your organization, will be chargeable to you.”
 

 The attorney for the Modern Amusements, Inc., in his letter of protest, stated that his client had made arrangements to promote negro baseball games, and to have a game every Friday night in July, August, September, and October, 1931; and that the action which the Public Service, Jnc., had taken in the matter would deprive the Modern Amusements, Inc., of the privilege of conducting such entertainment, which, in the opinion of the Modern Amusements, Inc., would be a profitable business.
 

 The Modern Amusements, Inc., did not abandon the leased premises, but, on the contrary, continued the staging of baseball games between teams composed of white men; and, on the 1st day of August, 1931, the Modern Amusements, Inc., availed itself of the privilege, expressed in the contract, of extending the term of the lease for another year, commencing on the 1st day of September, 1931, and ending on the 31st
 
 *903
 
 day of August, 1932. On the 11th day of September, 1931, which was in the beginning of the extension of the term of the lease, the lessee made a written request for, and was granted, the privilege of conducting football games, besides baseball games, during the hours stipulated in the original contract of lease. Thereafter, the lessee continued in the use and occupancy of the leased premises, by having both football and baseball games, between teams composed of white men, at night, until the end of the extended term of the lease. It appears, however, that the business was not profitable to the lessee.
 

 [1] If the lessee suffered a loss or was deprived of a profit by being forbidden to have negro baseball games in the park, the loss must have been very small, and is a matter of conjecture — not proof. The profit claimed to have been made on the game which was played on the night of the 17th of July, 1931, which was the only negro game played in the park, was less than $32; and that sum was subject to a deduction for the overhead expenses of the lessee. The judge who heard the case did not give written reasons for his judgment; hence we are not informed of the reason for allowing $4,300 damages. The only combination of figures, that would make $4,300, on the list of items claimed by the plaintiff are the two items, viz.: $800 in return of all of the rent paid by the lessee during the year for which the lease was extended, and $3,500 for the entire cost of the lighting equipment which was installed by the lessee and used during the whole term of the lease, including the extension. Inasmuch as the lessee was not evicted from the leased premises, but, on the contrary, elected to renew the lease for an additional year, surely the lessee is not entitled to payment for either of these items.' Although, as we have said, the lessee asked, in answer to the appeal taken by the lessor, that the amount of the judgment should be increased to $33,529.45, nevertheless, in the brief filed in this court, the lessee claims only three items of damages, in addition to the items allowed, viz.: (1) $1,194.45 for the cost of constructing seats, being $1,244.45 less $50 salvage; (2) $220 for the cost of liability insurance for the period from July 24, 1931, to the end of the term of the lease, including the extension; and (3) $1,600, being the salary of the general manager of the Modern Amusements, Inc., for sixteen months, being the last four months of the original term of the lease plus the twelve months term of the extension of the lease. Surely, none of these items of expense should be considered as a loss of profits, or a deprivation of profits, that might have been made by having negro baseball games in the park. As we have said, the only damages which the lessee could justly claim, if the lessor-had no right to forbid the letting of the park for negro baseball games, are the profits which the lessee was deprived of by being forbidden to have negto baseball games in the park. The reason why no other damages can be justly claimed is that the lessee was not evicted from the leased premises, but, on the contrary, continued to occupy and use the park for the purpose for which it was leased, not only to the end of the original term of the lease but also
 
 *905
 
 for the additional term of one year, for which the lessee elected to extend the term.
 

 Aside from the fact that there is no actual proof that the lessee would have made a profit on the business of conducting negro baseball games in the park if the lessee had been allowed to conduct such games, our opinion is that the lessor is not liable for any damages for forbidding the playing of negro baseball games in the park. The clauses in the contract of lease, which the vice president of the New Orleans Public Service, Inc., referred to in his letter of July 24, 1931, forbidding the playing of negro baseball games in the park, are these:
 

 “The lessee agrees to maintain at all times sufficient policemen to maintain law and order, at its own expense, and to abide by all rules and regulations prescribed by the lessor. * * *
 

 “Lessee covenants to operate business in a manner that will not be objectionable or offensive.”
 

 The plaintiff contends that the obligation “to abide by all rules and regulations prescribed by the lessor” had reference to rules and regulations theretofore or already, prescribed by the lessor. But that is not a reasonable interpretation of the clause in the contract, because there were no rules or regulations prescribed by the lessor, when the contract was entered into. The only rules or regulations that that clause in the contract could have had reference to were such rules or regulations as the lessor might thereafter prescribe.. Moreover, that clause in the contract must be construed with reference to the context, and particularly with reference to the obligation to see to the maintenance of law and order, and with reference to the obligation to conduct business on the leased premises in a manner not objectionable or offensive.
 

 It must be conceded that the clause in the contract, allowing the lessor to prescribe rules and regulations for the conducting of baseball games on the leased premises, did not allow the lessor to prescribe an unjust or unreasonable rule or regulation. But, considering that the park was in a neighborhood of residences occupied by white families, and considering that the first and only game of negro baseball played in the park brought on a fight and a disturbance of the peace, and considering that the lessor, being a public service 'corporation, was necessarily solicitous of the good will of the public, our opinion is that the proscribing of negro baseball games in Kempster Park at night was not an unreasonable rule or regulation. The reasonableness of the rule or regulation was established by the lessor immediately after the proscribing of negro baseball games in the park. On receipt .of the letter from the lessee, expressing the intention to attempt to hold the lessor liable for damages, the lessor drafted petitions and had them circulated among the residents in the vicinity of Kempster Park, requesting the signature of all who objected to the playing of baseball games by negro teams in Kempster Park at night; and 659 white men and women residing in the immediate vicinity of the park signed the petition, and each of them gave his or her address. Conceding, as we do concede,
 
 *907
 
 that these petitions have not the same importance that they would have if they had been signed before the lessor forbade the lessee to allow negro baseball games to be played in the park, the petitions show, nevertheless, that the lessor was right in apprehending that the playing of negro baseball games in Kempster Park at night would be at least objectionable, if not offensive to the residents in the vicinity of the park.
 

 It is contended by council for the lessee that a decision of this court allowing the lessor to forbid the playing of baseball games by negroes on the leased premises would constitute a discrimination against the negroes on account of their race or color, and would be violative therefore of the Fourteenth Amendment of the Constitution of the United States, and the appropriate legislation which the Congress has enacted to enforce the same, specifically, 8 U.S.C.A. §§ 41, 42, and 43, U.S.Rev.Stat. §§ 1977, 1978, and 1979. The constitutional mandate against racial discrimination has reference to statutes or municipal ordinances — not private contracts. We recognize, however, that the judicial department, as well as the legislative department is subject to the constitutional mandate against racial discrimination. In this instance, there is no discrimination against negro baseball players on account of their race or color. It was not the race or color of the players, but the combination of facts and circumstances, which we have related, that justified the lessor, in this instance, in forbidding the playing of baseball games by negro players on the leased premises at night.
 

 The judgment appealed from is set aside and the demand of the plaintiff is rejected and the suit is dismissed at plaintiff’s cost.