**Peter H. BEER et al., Plaintiffs,**

**v.**

**UNITED STATES of America et al.,
Defendants,
and
Johnny Jackson, Jr., et al., Intervenors.**

**Civ. A. No. 1495–73.**

United States District Court,
District of Columbia.

March 15, 1974.

James R. Stoner, James R. Treese, Stoner, Treese & Ruffner, Washington, D. C., Blake G. Arata, City Atty. and Ernest L. Salatich, Asst. City Atty., New Orleans, La., for plaintiffs.

M. Karl Shurtliff, Walter Gorman, and Nathaniel Friends, Attys., Dept. of Justice, for defendants.

Stanley A. Halpin, Jr., Kidd, Katz & Halpin, Charles E. Cotton, Cotton, Jones & Fazande, New Orleans, La., Charles E. Williams, III, Jack Greenberg, James M. Nabrit, III, and Eric Schnapper, New York City, and Wiley A. Branton, Washington, D. C., for intervenors.

Before ROBINSON, Circuit Judge, and CORCORAN and WADDY, District Judges.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

The City of New Orleans, Louisiana, seeks a judgment, pursuant to Section 5 of the Voting Rights Act of 1965,[1] declaring that its plan of redistricting for councilmanic elections does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color.[2] The plan is the City's current response to the call of its charter for action decennially to assure councilmanic districts approximately equal in population.[3] The City contends that the plan is a projection of legitimate criteria conceived objectively and applied without potential discriminatory consequences. The Government[4] and the intervenors[5] challenge this position on the ground that the plan will operate to dilute the vote of the city's black minority. The intervenors insist additionally that the plan was designed to achieve that very end.

Conformably with Section 5, this three-judge court was convened to hear and determine the controversy.[6] As hereinafter elaborated, we find that the redistricting which the plan proposes will have the effect of abridging the vote of the black citizenry of New Orleans.[7] So concluding, we do not reach the question whether the City's burden[8] of showing a racially nondiscriminatory purpose has been borne.

## I. THE EVOLUTION OF THE RE-DISTRICTING PROBLEM

### A. *Portents of the Problem*

The City of New Orleans embraces all of the territory of Orleans Parish, Louisiana. Lake Pontchartrain furnishes a natural boundary on the north, as the Mississippi River partly does on the south. The Mississippi also separates

---

1. Pub.L.No.89–110, § 5, 79 Stat. 439 (1965), as amended, 42 U.S.C. § 1973c (1970), quoted *infra* note 19.

2. Section 5 authorizes an action by a "State or [political] subdivision" for a judgment incorporating such a declaration. See note 19, *infra*. The present action is brought on behalf of the City by six of the seven members of the City Council. We accept that as a compliance with § 5.

3. New Orleans, La., Charter art. III, § 3–103(3) (1954), quoted *infra* note 18. See also Part II, *infra*.

4. The defendants herein are the United States and its Attorney General.

5. The intervenors are five black citizens registered to vote in New Orleans. Compare City of Petersburg v. United States, 354 F. Supp. 1021, 1024 (D.D.C.1972), aff'd sub nom., Diamond v. United States, 412 U.S. 934, 93 S.Ct. 2780, 37 L.Ed.2d 393 (1973). They are the plaintiffs in Jackson v. Council of City of New Orleans, Civ. No. 73–1862 (E.D.La.1973), wherein they seek, on constitutional grounds, reconstruction of the councilmanic districts differently from the concept embodied in the redistricting plan under review. Proceedings in that case have been deferred pending decision herein. See also note 44, *infra*. We allowed the intervention on the defendant side.

6. See note 19, *infra*. See also Beer v. United States 374 F.Supp. 357 at 359–360 (D.D.C.1974).

7. This opinion incorporates our findings of fact and conclusions of law. See Fed.R.Civ. P. 52(a).

8. See Parts V(B), VII(C), *infra*.

the southeasterly portion, known as Algiers, from the rest of the city. Travel between the two areas necessitates use either of the single bridge connecting Algiers and downtown New Orleans or the limited ferry service available. A controversy germinated by Algiers' persistent demand for more adequate means of transportation across the Mississippi was to color the redistricting activities leading to this litigation.[9]

The population of New Orleans is 593,471 persons, of whom 267,308 are black.[10] Registered voters in the City numbered 242,416 of whom 83,588 are black. White citizens thus comprise 55.-0% of the population and 65.5% of the voters; black citizens make up the remaining 45.0% of the population and 34.5% of the electorate. The large numerical strength of the black community as well as its much weaker proportional voting power were destined to play major roles in the gestation of the central issue in this case.[11]

Although some black families are to be found in most of the principal areas of New Orleans, there is no general geographical blending of black and white residences. The black population is heavily concentrated in a series of neighborhoods extending eastwardly and westwardly through the central part of the City; the areas lying north and south of this belt, with minor exceptions, are overwhelmingly white. This residential pattern looms large in any redistricting effort that would safeguard the black vote against dilution.[12]

Other relevant and important facets of the general situation in New Orleans derive from the scheme pursuant to which its legislative body is elected. That body is the City Council, composed of seven members, of whom five are chosen from single-member districts and the remaining two from the city at large.[13] Four of the five districts extend from the Mississippi River to Lake Pontchartrain, and thus traverse the entire city; the other district is a wedge-shaped portion of the downtown area.[14] Primary elections for the Council are by majority vote,[15] and singleshot voting is prohibited.[16] These phenomena cooperate with others inherent in the plan under consideration to pose the legal threat to the redistricting which the plan would bring about.[17]

B. *Crystallization of the Problem*

Toward the end of 1971, the City Council of New Orleans initiated procedures to redistrict the city for councilmanic elections. The catalyst for this undertaking was a provision of the city charter requiring the Council, after each national decennial census, to remake the districts into elective enclaves approximately equal in population.[18] From the beginning, the Council recognized that a plan reorganizing the district boundaries would constitute a suffrage change within the meaning of Section 5 of the Voting Rights Act,[19] requiring federal ap-

---

9. See Part II(A), *infra*.

10. These statistics, and others utilized in this opinion, are from sources compiled by city authorities.

11. See Part VI, *infra*.

12. See Part II, *infra*.

13. New Orleans, La., Charter art. III, § 3-102 (1954).

14. See Part VI, *infra*.

15. La.Rev.Stat.Ann. art. 18, § 358 (1966 supp.).

16. La.Rev.Stat.Ann. art. 18, § 351 (1966 supp.), quoted *infra* note 164.

17. See Part VI, *infra*.

18. New Orleans, La., Charter art. III, § 3-103(3) (1954), providing:

> It shall be the mandatory duty of the Council to redistrict the City by ordinance within six months after the official publication by the United States of the population of the City as enumerated in each decennial census. Each councilmanic district shall contain as nearly as possible the population factor obtained by dividing by five the City's population as shown by the decennial census.

19. Pub.L.No.89–110, § 5, 79 Stat. 439 (1965), as amended, 42 U.S.C. § 1973c (1970), providing:

> Whenever a State or political subdivision with respect to which the prohibitions set

proval prior to operation.[20] The saga of the Council's quest for approval is lengthy,[21] and for immediate purposes only the highlights of its endeavors need be recounted.[22]

On March 2, 1972, the Council enacted Ordinance No. 4796 M.C.S.,[23] which incorporated a scheme of redistricting (Plan I). Acknowledging the coverage of Section 5,[24] the City Attorney, on May 4, 1972, submitted Plan I to the Attorney General of the United States with a view to a determination that the plan ."[did] not have the purpose [and] will not have the effect of denying or abridging the right to vote on account of race or color." [25] On January 15, 1973, the Attorney General interposed an objection to Plan I on several grounds.[26] The boundaries of the dis-

---

forth in Section 1973b(a) of this title based upon determinations made under the first sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964, or whenever a State or political subdivision with respect to which the prohibitions set forth in section 1973b(a) of this title based upon determinations made under the second sentence of section 1973b(b) of this title are in effect shall enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1968, such State or subdivision may institute an action in the United States District Court for the District of Columbia for a declaratory judgment that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color, and unless and until the court enters such judgment no person shall be denied the right to vote for failure to comply with such qualification, prerequisite, standard, practice, or procedure: *Provided,* That such qualification, prerequisite, standard, practice, or procedure may be enforced without such proceeding if the qualification, prerequisite, standard, practice, or procedure has been submitted by the chief legal officer or other appropriate official of such State or subdivision to the Attorney General and the Attorney General has not interposed an objection within sixty days after such submission, except that neither the Attorney General's failure to object nor a declaratory judgment entered under this section shall bar a subsequent action to enjoin enforcement of such qualification, prerequisite, standard, practice, or procedure. Any action under this section shall be heard and determined by a court of three judges in accordance with provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court.

As thus made evident, a state or political subdivision is covered by § 5 if it falls within the ambit of § 4 of the Act, 42 U.S.C. § 1973b (1970), quoted in relevant part *infra* note 108. Section 4 intercepts, *inter alia,* states with respect to which it is determined that any one of several enumerated tests or devices was used on November 1, 1964, as a prerequisite to voting, and that less than 50% of the persons of voting age residing therein were registered on that date or actually voted in the presidential election of November, 1964; and the political subdivisions of any such state are likewise intercepted. See note 108, *infra,* and Part III(C), *infra.* Louisiana was brought under § 4 on August 7, 1965, 30 Fed.Reg. 9897 (1965), and so it remains, with the result that New Orleans is within the purview of § 5.

20. See Part II, *infra.*

21. From the time of receipt of usable 1970 census figures in late 1971 until shortly prior to the filing of this action in July, 1973, the Council and its research staff engaged extensively in the development of redistricting concepts and proposals, in the drafting and consideration of implementing ordinances, in the conduct of public hearings thereon and in related activities. See Part II, *infra.*

22. See Part VI(B), *infra.*

23. When legislative proposals are first introduced, ordinance calendar (O.C.) numbers are assigned for easy reference during consideration. Ordinances which have been adopted by the Council and acted on by the Mayor are designed "Mayor Council Series" (M.C.S.).

24. See note 19, *supra,* and Part IV(A), *infra.*

25. This is the standard for measurement of the validity of New Orleans' redistricting plans. See note 19, *supra,* and Part V, *infra.*

26. The letter communicating the Attorney General's ruling on Plan I reads:
 This is in reference to your submission to the Attorney General pursuant to Sec-

tricts projected, he stated, "appear [] to dilute black voting strength by combining a number of black voters with a larger number of white voters in each of the five districts." [27] "[I]t does not appear," he added, "that the district lines are drawn as they are because of any compelling governmental need," [28] and the lines "do not reflect numeric population configurations or considerations of district compactness or regularity of shape." [29] By force of Section 5, the effect of this objection was to render Plan I inoperable unless and until this court granted approval in accordance with the standard prescribed by that section.[30]

Subsequently, and after attempts to enlarge its membership through a charter amendment were aborted,[31] the Council, on May 3, 1973, passed Ordinance No. 5154 M.C.S., which adopted another redistricting scheme (Plan II). That scheme effected some modifications of Plan I,[32] and on May 10, 1973, the City Attorney submitted it to the Attorney General. A second objection interposed by the Attorney General on July 9, 1973, reiterated the grounds originally advanced and cited additional reasons for his disapproval of Plan II.[33] The Attorney General concluded "that the boundary lines prescribed by [Plan II]

tion 5 of the Voting Rights Act of 1965 of City Council Ordinance 4796 M.C.S. which reapportioned the councilmanic districts of the City of New Orleans. This submission was received by this Department on November 15, 1972.

We have given careful consideration to the submitted changes and the supporting information as well as data compiled by the Bureau of the Census and information and comments from interested parties. Our analysis shows that the district boundary lines in the submitted plan are drawn in a manner which appears to dilute black voting strength by combining a number of black voters with a larger number of white voters in each of the five districts. Moreover, it does not appear that the district lines are drawn as they are because of any compelling governmental need and they do not reflect numeric population configurations or considerations of district compactness or regularity of shape. Under these circumstances we cannot conclude, as we must under the Voting Rights Act, that this plan of reapportionment for the New Orleans Council will not have a racially discriminatory effect on voting. Consequently, on behalf of the Attorney General I must interpose an objection.

We have reached this conclusion reluctantly because we fully understand the complexities facing the city in designing a reapportionment plan to satisfy the needs of the city and its citizens and, simultaneously, to comply with the mandates of the federal Constitution and laws. We are persuaded, however, that the Voting Rights Act compels this result.

Of course, Section 5 permits you to seek a declaratory judgment from the District Court for the District of Columbia that this plan neither has the purpose nor will

have the effect of denying or abridging the right to vote on account of race. Until such a judgment is rendered by that Court, however, the legal effect of the objection of the Attorney General is to render unenforceable this reapportionment plan.

In this connection, I wish to bring to your attention our receipt on January 12, 1973, of your City Council Ordinance 5026 M.C.S. which calls for a referendum election on March 20, 1973, on the question of increasing the size of the City Council from seven to nine members. We will review that submission and let you know the Attorney General's determination as soon as possible. However, I also wish to point out that should the increase in the size of the council be approved at the referendum, any districting plan drawn up as a result must also meet the clearance requirements of Section 5.

27. See note 26, *supra*.

28. See note 26, *supra*.

29. See note 26, *supra*.

30. See note 19, *supra*.

31. See Part II(B), *infra*.

32. See Part II(A), *infra*.

33. The Attorney General's ruling on Plan II reads:

This is in reference to your submission to the Attorney General pursuant to Section 5 of the Voting Rights Act of 1965 of City Council Ordinance 5154 M.C.S. which reapportioned the councilmanic districts of the City of New Orleans. This submission was received by this Department on May 10, 1973.

We have given careful consideration to the submitted changes and the supporting information as well as data compiled by

appear to effect a dilution of black voting strength in the same manner as did the boundary lines prescribed in [Plan I]." [34] He found that "[w]hile . . . there are significant differences between [Plans I and II] especially in regard to the number of non-contiguous districts and the population by race of proposed District B," [35] Plan II, like Plan I, "nevertheless combines a number of black voters with a larger number of white voters in four of the five districts." [36] He further found that the district lines set in Plan II, like those drawn in Plan I, "do not appear to have been passed on any compelling governmental need or to reflect numeric population configurations or considerations of district compactness or regularity of shape." [37]

Continuing, the Attorney General was of the view

the Bureau of the Census and information and comments from interested parties. In addition we have utilized the information and data which you had previously provided this office in connection with our consideration of Ordinance 4796 M.C.S., pursuant to Section 5 of the Voting Rights Act of 1965.

Our analysis shows that the boundary lines prescribed by Ordinance 5154 M.C.S. appear to effect a dilution of black voting strength in the same manner as did the boundary lines prescribed in Ordinance 4796 M.C.S. to which an objection was interposed on behalf of the Attorney General on January 15, 1973. Under these circumstances we cannot conclude, as we must under the Voting Rights Act of 1965, that this plan of reapportionment for the New Orleans City Council will not have a racially discriminatory effect on voting. Consequently, on behalf of the Attorney General I must interpose an objection to the reapportionment plan outlined in Ordinance 5154 M.C.S.

While we recognize that there are significant differences between the reapportionment plans proposed in Ordinance numbers 4796 and 5154 especially in regard to the number of non-contiguous districts and the population by race of proposed District B, Ordinance 5154 M.C.S. nevertheless combines a number of black voters with a larger number of white voters in four of the five districts. Moreover, the district lines in the instant submission do not appear to have been based on any compelling governmental need or to reflect numeric population configurations or considerations of district compactness or regularity of shape.

Our evaluation of Ordinance numbers 4796 and 5154 indicates that the objectionable dilution of black voting strength in both redistricting plans is primarily attributable to the vertical shape of the submitted districts. Because the predominantly black neighborhoods in the city are located generally in an east to west progression, the vertical districts in the submitted plans divided the black neighborhoods and combined them with white areas in the north and the south of the city resulting in districts with more white than black voters.

Although the shape of the submitted districts may have been in part based upon the shape of the seventeen wards in New Orleans, the wards do not of themselves define official boundaries bearing upon the election of or representation by city council members, and adherence to the traditional shape of the wards may not serve to justify the resulting prohibited dilution of black voting strength under Section 5.

We do not mean by this analysis to imply that other reapportionment plans based upon vertical districts will necessarily divide the black neighborhoods in the city to the degree found objectionable here. We have determined, however, that a dilutive result similar to that found in the submitted plan is difficult to avoid when such districts are utilized to the extent found in the submitted plan, and that the extent to which such districts were utilized is not necessary to achieve a successful reapportionment of the city's population.

If you desire any further explanation of the basis for the objection herein, or believe that such further explanation would be helpful in fashioning a redistricting plan which avoids the objectionable features of the submitted plan, please do not hesitate to contact us. Of course, Section 5 permits you to seek a declaratory judgment from the District Court for the District of Columbia that this plan neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race. Until such a judgment is rendered by that Court, however, the legal effect of the objection of the Attorney General is to render unenforceable this reapportionment plan.

34. See note 33, *supra*.

35. See note 33, *supra*.

36. See note 33, *supra*.

37. See note 33, *supra*.

that the objectionable dilution of black voting strength in both redistricting plans is primarily attributable to the vertical shape of the submitted districts. Because the predominantly black neighborhoods in the city are located generally in an east to west progression,[38] the vertical districts in the submitted plans divided the black neighborhoods and combined them with white areas in the north and the south of the city resulting in districts with more white than black voters.[39]

And "[a]lthough the shape of the submitted districts may have been in part based upon the shape of the seventeen wards in New Orleans,"[40] the Attorney General pointed out that "the wards do not of themselves define official boundaries bearing upon the election of or representation by city council members, and adherence to the traditional shape of the wards may not serve to justify the resulting prohibited dilution of black voting strength under Section 5."[41]

So, said the Attorney General, while "[w]e do not mean by this analysis to imply that other reapportionment plans based upon vertical districts will necessarily divide the black neighborhoods in the city to the degree found objectional here,"[42]

[w]e have determined, however, that a dilutive result similar to that found in the submitted plan is difficult to

avoid when such districts are utilized to the extent found in the submitted plan, and that the extent to which such districts were utilized is not necessary to achieve a successful reapportionment of the city's population.[43]

The failure to gain the Attorney General's approbation for either plan has left New Orleans unable to conduct councilmanic elections on a redistricted basis.[44] That, in turn, prompted six members of the Council to file this action on July 25, 1973, seeking a judgment declaring that Plan II neither has the purpose nor will have the effect of denying or abridging the right to vote on account of race or color.[45] We have held four days of hearings during which a great deal of evidence of various sorts was introduced by testimony, both live and deposed, stipulations and exhibits. The parties have also briefed the issues extensively, and have presented oral argument.[46] Once these voluminous materials are sifted and organized, the relevant facts appear without material contradiction, and the legal aspects of the New Orleans picture come into sharp focus.

## II. THE EVOLUTION OF THE RE-DISTRICTING PLANS

The spadework for plans delineating a redistricting of New Orleans were performed by the Council's research staff, an administrative arm.[47] The two ver-

38. See Part I(A), *supra.*

39. See note 33, *supra.*

40. See note 33, *supra,* and note 219, *infra.*

41. See note 33, *supra.*

42. See note 33, *supra.*

43. See note 33, *supra.*

44. See note 19, *supra.* As we have previously observed in this case, "Section 5 itself enjoined any election utilizing the district boundaries specified in [Plan II]," Beer v. United States, *supra* note 6 at 362, and we earlier issued, at the City's unopposed request, a temporary injunction that "spelled out the statutory prohibition against councilmanic elections" based on that plan. *Id.* See also City of Petersburg v. United States, *supra* note 5, 354 F.Supp. at 1023–

1024. We note that in Jackson v. Council of City of New Orleans, *supra* note 5, the District Court for the Eastern District of Louisiana has also enjoined temporarily the Orleans Parish Democratic and Republican Executive Committees from taking any steps in the councilmanic electoral process, or in the enforcement of the city charter's reapportionment provision or ordinances enacted pursuant thereto. (order of Aug. 31, 1973).

45. See note 19, *supra.*

46. See also Beer v. United States, *supra* note 6, 374 F.Supp. at 359–360.

47. The research staff is charged with the duties of conducting research on legislative, fiscal and administrative matters; of drafting ordinances on requests from councilmen; of keeping the Council informed of the needs and actions of city agencies in areas of leg-

sions which emerged from the Council as Plans I and II were adaptations of staff proposals to the views prevailing among the councilmen. To gain the proper perspective on Plan II, the subject of this litigation, we must examine the evolution of both of the plans.

## A. *The Formulation of Plan I*

Armed with the 1970 census figures, guidelines of the Attorney General promulgated pursuant to Section 5,[48] a recent federal court decision on legislative reapportionment in Louisiana,[49] and other data,[50] the research staff developed numerous redistricting concepts, some of which evolved into concrete plans for consideration by the Council. A group of several factors exerted the primary influence on the staff's determinations leading to the district boundaries set by the submission which ultimately became Plan I.

The staff gave principal attention to the city charter's demand for five councilmanic districts of equal population.[51] Beyond this, the staff noted instructions of the City Attorney,[52] supplementing the Attorney General's guidelines, to avoid lines which would divide concentrations of minority voters and thereby reduce their voting strength.[53] The

staff also undertook to observe, as far as possible, traditional political boundaries —ward and precinct lines[54]—and natural geographic boundaries—the Mississippi River and Lake Pontchartrain, as well as major streets and canals. Yet another effort was to steer clear of boundaries which would place two or more incumbent councilmen in the same district.[55] And the staff endeavored to keep the councilmanic districts compact and geographically integral.[56]

The complex question of Algiers, and the inseparable dispute over additional bridging of the Mississippi River, were also instrumental in shaping Plan I. Algiers, as we have mentioned, is disjoined by the Mississippi from downtown New Orleans, and only one bridge spans the river from Algiers to downtown New Orleans.[57] The bridge is the principal corridor for needed access by the residents of Algiers to the remainder of the city; an infrequent ferry service is of little use to the daily commuter. Algiers is a high-growth residential area, and its citizens do not fully share with other inhabitants of the city the same political and economic concerns.[58] Transportation across the river to and from Algiers is dear to the people living there, and is a much debated issue in New Orleans.[59]

---

islative concern; and of supervising overall the Council's housekeeping chores.

48. 28 C.F.R. pt. 54 (1973).

49. Taylor v. McKeithen, 333 F.Supp. 452 (E.D.La.1971), vacated and remanded, 407 U.S. 191, 92 S.Ct. 1980, 32 L.Ed.2d 648 (1972).

50. See notes 51–59, *infra.*

51. See note 18, *supra,* and Part VII, *infra.*

52. The City Attorney prepared a digest of the Attorney General's guidelines and court decisions to assist the staff in its redistricting activities.

53. See Part IV(C), *infra.*

54. See note 219, *infra.*

55. See Part VI(C), *infra.*

56. See Part VI(C), *infra.*

57. See text *supra* at note 9.

58. Although residents on both sides of the Mississippi have a common interest in the river traffic, physical separation from the remainder of the city has been responsible for a feeling of independence among those who live in Algiers.

59. The existing bridge connects Algiers and downtown New Orleans. Uptown residents have argued that construction of a new bridge would turn a basically residential area into a main thoroughfare; downtown residents express concern that a second bridge would add more traffic congestion to an already overburdened area. The residents of Algiers have vigorously urged a new bridge, irrespective of location, as a necessary means of alleviating pressures on the limited facilities existing, and of accommodating the growing transportation needs of a burgeoning population. Although the City Council is not authorized to construct any new bridges or change the ferry schedules, it is responsi-

The mix of the above elements produced a proposal to adopt the redistricting scheme which was to become Plan I. The proposal, O.C. No. 5194, was presented for community views at three public hearings. The plan envisioned the division and distribution of the territory of Algiers among three different councilmanic districts, and to this the residents of Algiers voiced strong objection. Several black groups vigorously opposed the plan because, by their estimate, it diluted the black vote;[60] in an effort to increase the potential for black representation on the Council,[61] they sought to restructure the plan to provide for as many as eleven single-member districts. Nonetheless, with slight modifications, the proposal passed the Council as Plan I, becoming Ordinance No. 4796 M.C.S., only to be disapproved by the Attorney General.[62]

## B. *Impediments to Black Suffrage*

At the hearings on Plan I, black citizens' groups advocated both an increase in the size of the City Council and the elimination of at-large elections of councilmen. The goal of this approach was greater opportunity for black voters to take part meaningfully in the selection of those who are to sit on the Council. Witnesses claimed that the existing scheme—five councilmen from districts and two at large—perpetuated limitations on the ability of the black voting population to engage effectively in the choice of councilmanic membership. In recounting from hard personal experi-

ence the barriers to full political participation by minorities, black opponents of Plan I cited a variety of restraints which we find quite revealing.

As the prime example of past discriminatory practice, the expansionists stressed the long history of racial segregation in education, housing, public facilities and virtually all facets of everyday life in New Orleans.[63] With special reference to suffrage, witnesses attested to past voting practices which worked to exclude blacks from the registration rolls and to stifle minority participation in elections.[64] Even until recent times, they reminded listeners, strict proof of residency of specified duration, and confinement of registration to one location —the city hall—had persisted as obstacles to black would-be voters.[65]

Testimony at the hearings further indicated that the candidate-selection process preceding councilmanic campaigns created additional problems for New Orleans' black citizens. To maximize citywide exposure, aspirants for councilmanic office are often invited to join mayoral tickets and to campaign with mayoral candidates as a team, and invitees are the personal choices of those candidates.[66] Endorsements from local organizations—the white political power structure—are another component in the selection. Black citizens running for office are hampered both by their generally more individualistic political philosophies and their more limited financial resources.[67] No black person has ever won election to the Council.

---

ble for communicating the views of its constituents to the State Department of Highways, the implementing agency.

60. See Part VI, *infra.*

61 See Part II(B), *infra.*

62. See Part I(B), *supra.*

63. See Part VII(C), *infra.*

64. See Part VII(C), *infra.*

65. Since the present Council assumed office in 1970, some efforts have been made to get registrars out onto local college campuses and into neighborhood fire stations near election time. It was not, however, until after the filing of this suit that registrars

made concerted efforts to regularly move into the community to facilitate the qualification of eligible minority citizens.

66. An invitation to participate on a ticket with a mayoral candidate has the effect of reducing campaigning costs since each member of the ticket contributes some of his or her campaign funds to the ticket in order to get the benefit of citywide publicity and exposure.

67. Not only are candidates expected to espouse a philosophy which is palatable to the organization, but they are also expected to assist the organization by financial contributions to defray the cost of getting out the vote for its endorsees.

To overcome the barriers of endorsements and campaign assistance, most black candidates have run independent —albeit losing—campaigns, focusing their appeal on the black community. In recent years, the only four successful black candidates for city-wide office in New Orleans were recipients of support from white organizations [68] or white candidates.[69] As suggested at the hearings, the achievements of these candidates cannot be equated with open access to the voting booth and equal weight of the vote in the count.[70]

According to the expansionists, the need for increased representation on the City Council was exacerbated by the unresponsiveness of city officeholders to the wishes and wants of the black minority.[71] Indicia of the failure of the all-white City Council to react favorably to the concerns of the black community were legion. Advocates of improved municipal services received a deaf ear from the Council more often than not. Efforts to pave streets, maintain parks and improve recreational areas in black neighborhoods have more lately been bolstered, not by improved attitudes on the part of counsel members, but by pressure to utilize funds provided by federal programs. Good faith efforts of some public officials have brought assistance to black constituents, but examples are relatively scarce.

The white and black communities of New Orleans are polarized in political matters, and that is perhaps best manifested by the incidence of bloc voting in New Orleans. The record documents a history of bloc voting substantially along racial lines in both white- and black-occupied areas.[72] The results of modern elections which black candidates entered, or in which issues of special concern to black voters are aired, demonstrate a strong trend toward overwhelming support for black candidates and "black" issues in black neighborhoods with minimal support in white neighborhoods, and vice versa.[73] Speakers at the hearings asserted that where black voters constitute a minority of the total voting population, as is the case in New Orleans, the negative impact of bloc voting would further impair their ability to participate effectively in political activities.

To this array of factors delimiting black access to the political process, the expansionists added certain structural elements as further proof that the black vote would continue to suffer if the City Council remained small in membership and the at-large seats were preserved. In New Orleans two such elements, both

68. Black political organizations did not come into existence in New Orleans until the late 60's. The formation of these organizations was precipitated by the significant increase in black voter registration after passage of the Voting Rights Act of 1965. These organizations have hoped to serve as bases for more active minority participation in the electoral process and as a source of support for black aspirants for political office.

69. A black candidate for the Louisiana Court of Appeals ran unopposed when his opponent withdrew for personal reasons. Another black candidate, who won in his bid for the Criminal District Court, had as his campaign co-chairmen the then Governor of Louisiana and the Mayor of New Orleans. Still another black candidate, for the school board, ran successfully on a ticket with a past president of the board. Since this litigation began, a black candidate was elected clerk of the Criminal District Court with the Mayor's support.

70. See Part VII (C), infra.

71. See Part VII (C), infra.

72. See Part VII (C), infra.

73. Dominance of the Democratic Party in New Orleans has traditionally made success in Democratic primaries tantamount to victory in general elections. The only notable exception in recent years was a race in 1970 for a New Orleans seat in the state legislature. A black candidate won the Democratic nomination, but a white Republican who qualified against him was elected in the general election; and so it was that for the first time in this century the district from which they ran was represented by a Republican. The results of the election were plainly attributable to bloc voting, with predominantly white wards, traditionally Democratic in registration, supporting the white Republican candidate over his black Democratic opponent.

of statutory origin, are of particular significance. The expansionists attacked the majority-vote requirement [74] and the anti-singleshot provision [75] as primary-election mechanisms which depreciate the ballot of the black voter in councilmanic elections. The majority-vote rule obscures a black candidate's chances of winning even if he were to receive all of the black vote.[76] Without the possibility of a plurality victory by his candidate, the minority voter's influence on the election results is sharply reduced. The anti-singleshot law provides that if two or more offices are to be filled—as, for example, the two at-large seats on the City Council—a voter must vote for candidates equal in number to the number of offices at stake, or else have his ballot invalidated with respect to all of those offices.[77] So, although a voter wishes to support but one aspirant for an at-large seat on the Council, he must cast a vote against his candidate in order to have his vote for that candidate counted.

The expansionists' arguments won a limited victory temporarily. Subsequent to the public hearings, the City Council approved ordinances offering the voters of New Orleans alternatives to a seven-member legislative body and two of them were successfully submitted to separate citywide referenda. The first, Ordinance No. 4923 M.C.S., called for an expansion to eleven members, nine from districts and two at large; the second, Ordinance No. 5026 M.C.S., specified an expansion to nine members, seven from districts and two at large.[78] Although neither ordinance embodied the central proposal advanced by black spokespersons—elimination of at-large voting, and election of all councilmen from single-member districts, as an essential feature of any expansion—both ordinances were supported by the black vote ostensibly on the theory that enlargement of council membership in any form was superior to the existing scheme, and raised some hope for fairer minority representation. Neither proposal received any support from white political organizations, however, and both were eventually defeated by the preponderant white vote. vote.

## C. *The Formulation of Plan II*

Following the rejection by the electorate of plans for expansion of the City Council, and principally in response to vociferous outrage over the tripartite split of Algiers in Plan I, a member of the Council directed the research staff to redraw that plan to incorporate all of Algiers into one district and to readjust the boundaries of other districts accordingly. This the staff did and one of the products of its efforts ultimately became Plan II. The staff considered the same criteria it had utilized in promulgating Plan I,[79] but the Algiers question appears to have been the overriding concern in the restructuring of districts. Very importantly, the factors which persuaded the Attorney General to disapprove Plan I [80] did not undergo reconsideration by the staff in the formulation of the concepts leading to, Plan II. The staff commenced and completed its work on Plan II while Plan I was under review by the Attorney General and before he interposed his objection to it.[81]

In toto, four new schemes revising Plan I [82] were submitted by the staff

74. La.Rev.Stat.Ann. art. 18, § 358 (1966 supp.).

75. *Id.* at § 351, quoted *infra* note 164.

76. See Part VII(C), *infra*.

77. See Part VII(C), *infra*.

78. Of a total of five expansion proposals adopted by the Council, only these two reached a referendum.

79. See Part II(A), *supra*.

80. See note 26, *supra*, and accompanying text.

81. The staff transmitted its proposals in November 1972. The Attorney General did not announce his ruling on Plan I until January 15, 1973. See Part II(C), *infra*.

82. One alternative was a modification of Plan I which retained the configurations of two districts, changed the boundaries of the other three districts, and placed all of Al-

and considered by the Council. In the meantime, the Attorney General rejected Plan I,[83] but it does not appear that the Council addressed specifically the flaws which the Attorney General identified in that version. The eventual Plan II—relatively little more than a modification of Plan I placing Algiers in a single district—was aired at two additional public hearings and passed by the Council with only a minor amendment—the shifting of a precinct from one district to another. Again the Attorney General registered an objection in the view that the second plan, as had the first, failed to meet the test of Section 5,[84] and that left the fate of Plan II to the courts.[85]

## III. THE HISTORICAL EVOLUTION OF SECTION 5

### A. *The Constitutional Background*

Section 1 of the Fifteenth Amendment pledges that "[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude." And so, "without further legislative specification,"[86] Section 1 "invalidate[s] state voting qualifications or procedures which are discriminatory on their face or in practice."[87] The Fif-

teenth Amendment, however, does not rest protection of the right to vote entirely on the majestic pronouncement made by Section 1, but in Section 2 provides that "[t]he Congress shall have the power to enforce this article by appropriate legislation." "This power, like all others vested in Congress, is complete in itself, may be exercised to the utmost extent, and acknowledges no limitations, other than are prescribed in the constitution."[88]

The wisdom of coupling with the guaranty of Section 1 the broad enforcement authority conferred by Section 2 was fully demonstrated by the experience accumulated over the 95 years following ratification of the Fifteenth Amendment in 1870. For notwithstanding the self-executing nature of Section 1 and its enforceability in the courts, the promise it made far out ran actual realization. The grandfather clause,[89] the white primary,[90] the discriminatory challenge[91] and the black gerrymander,[92] though ultimately declared illegal, attested the multiform opposition to racial equality in voting persistent in some sections of the country. Among the subtler, but certainly not the feebler, devices suppressing black suffrage were literacy tests discriminatorily conceived and administered.[93] In

giers in one district. In addition, it placed two incumbent councilmen in a single district. The remaining alternatives were variations on that scheme, adjusting the lines of two of the districts.

83. See Part I(B), *supra.*

84. See Part I(B), *supra.*

85. See note 19, *supra.* See also Beer v. United States, *supra* note 6, 374 F.Supp. at 360–362.

86. Section 1 has uniformly been construed as self-executing. See South Carolina v. Katzenbach, 383 U.S. 301, 325, 86 S.Ct. 803, 816, 15 L.Ed.2d 769 (1966).

87. *Id.,* and see cases there cited.

88. *Id.* at 327, 86 S.Ct. at 818, quoting Gibbons v. Ogden, 22 U.S. (9 Wheat.) 1, 196, 6 L.Ed. 23 (1824).

89. See Guinn v. United States, 238 U.S. 347, 364–365, 35 S.Ct. 926, 59 L.Ed. 1340 (1915) ;

Myers v. Anderson, 238 U.S. 368, 382, 35 S. Ct. 932, 59 L.Ed. 1349 (1915) ; Lane v. Wilson, 307 U.S. 268, 275, 59 S.Ct. 872, 83 L. Ed. 1281 (1939).

90. See Nixon v. Condon, 286 U.S. 73, 89, 52 S.Ct. 484, 76 L.Ed. 984 (1932) ; Nixon v. Herndon, 273 U.S. 536, 540, 47 S.Ct. 446, 71 L.Ed. 759 (1927). Compare Grovey v. Townsend, 295 U.S. 45, 54, 55 S.Ct. 622, 79 L.Ed. 1292 (1935) with Smith v. Allwright, 321 U.S. 649, 664–665, 64 S.Ct. 757, 88 L. Ed. 987 (1944), and Terry v. Adams, 345 U.S. 461, 470, 73 S.Ct. 809, 97 L.Ed. 1152 (1953).

91. See United States v. Thomas, 362 U.S. 58, 59, 80 S.Ct. 612, 4 L.Ed.2d 535 (1960).

92. See Gomillion v. Lightfoot, 364 U.S. 339, 347, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960).

93. See Schnell v. Davis, 336 U.S. 933, 69 S. Ct. 749, 93 L.Ed. 1093 (1949) ; Alabama v. United States, 371 U.S. 37, 83 S.Ct. 145, 9 L.Ed.2d 112 (1962) ; Louisiana v. United

the wake of these techniques was widespread disenfranchisement of black citizens in areas where the black population was large.[94]

That was the sad reality in 1965, despite the best efforts of those who had advocated voting equality in the courts and others who had pushed for stronger voting rights laws in Congress. Another reality, equally stark, was that each of those approaches had suffered from its own difficulties. Post-Civil War statutes on the subject had proven ineffective, and modern federal legislation had aimed at facilitating case-by-case litigation of suffrage discrimination.[95] Attempts to enforce the constitutional mandate entailed numerous lawsuits, which all too frequently became individually onerous and protracted.[96] Beyond that, adjudications removing one obstacle to equality ofttimes went for naught in the face of substitution of another obstacle, or even of defiance or evasion of court orders.[97] The net of it all was relatively little gain in black voting.[98]

As the House Judiciary Committee was to observe in 1965, "[t]he historic struggle for the realization of this constitutional guarantee indicates clearly that our national achievements in this area have fallen far short of our aspirations."[99]

## B. The Voting Rights Act

The Voting Rights Act of 1965 mounted the Nation's most formidable legislative assault upon the massive problem of voting discrimination. As the history of the Act discloses, "Congress felt itself confronted by an insidious and pervasive evil which had been perpetuated in certain parts of our country through unremitting and ingenious defiance of the Constitution." [100] And as the Act itself reveals, "Congress concluded that the unsuccessful remedies which it prescribed in the past would have to be replaced by sterner and more elaborate measures in order to satisfy the clear commands of the Fifteenth Amendment." [101]

The 1965 congressional approach to this task was marked by renewed determination and a changed philosophy. The Voting Rights Act "implemented Congress' firm intention to rid the country of racial discrimination in voting." [102] It "was designed by Congress to banish the blight of racial discrimination in voting, which [had] infected the electoral process in parts of our country for nearly a century." [103] It was "draft-

---

States, 380 U.S. 145, 153, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965).

94. See H.Rep.No.439, 89th Cong., 1st Sess. 8–16 (1965) ; South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 313, 86 S.Ct. 803.

95. See South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 313, 86 S.Ct. 803.

96. See H.Rep.No.439, 89th Cong., 1st Sess. 9–11 (1965) ; South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 314–315, 86 S.Ct. 803.

97. See South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 314, 86 S.Ct. 803.

98. "Another measure of the effectiveness of existing civil rights statutes and their case-by-case enforcement is to be found in voter registration statistics in those areas where Federal litigation has been previously concentrated. For example, in Alabama, the number of Negroes registered to vote has increased by only 5.2 percent between 1958 and 1964 to 19.4 percent; in Mississippi, approximately 6.4 percent of voting age Ne-

groes were registered in 1964 compared with 4.4 percent in 1954; and in Louisiana, the increase in Negro registration has been imperceptible—from approximately 31.7 percent in 1956 to approximately 31.8 percent of the eligible Negroes registered as of January 1, 1965. Meanwhile, the percentage of registered white voters in Louisiana is 80.2 percent." H.Rep.No.439, 89th Cong., 1st Sess. 10 (1965). See also South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 313, 86 S.Ct. 803.

99. H.Rep.No.439, 89th Cong., 1st Sess. 8 (1965).

100. South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 309, 86 S.Ct. at 808.

101. *Id.*

102. Allen v. State Bd. of Elections, 393 U.S. 544, 548, 89 S.Ct. 817, 822, 22 L.Ed.2d 1 (1969).

103. South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 308, 86 S.Ct. at 808. See also *id.* at 315, 86 S.Ct. 803.

ed to make the guarantees of the Fifteenth Amendment finally a reality for all citizens;[104] it "was aimed at the subtle, as well as the obvious, state regulations which have the effect of denying citizens their right to vote because of their race."[105] For "Congress realized that existing remedies were inadequate to accomplish this purpose and drafted an unusual, and in some aspects a severe, procedure for insuring that States would not discriminate on the basis of race in the enforcement of their voting laws."[106]

## C. *Sections 4 and 5*

A reading of the Act in its entirety tells how extensively Congress pursued these objectives. We need not canvass all provisions of the Act,[107] for our immediate concern is Section 5. We must, however, examine that section in light of Section 4, with which Section 5 and other remedial provisions of the Act are closely related.

Section 4 automatically suspends compliance with any "test or device" as a precondition to voting in any state or political subdivision "which (1) the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (2) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November, 1964."[108] The coverage of Section

104. Allen v. State Bd. of Elections, *supra* note 102, 393 U.S. at 556, 89 S.Ct. at 826. See also South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 308, 309, 86 S.Ct. 803.

105. Allen v. State Bd. of Elections, *supra* note 102, 393 U.S. at 565, 89 S.Ct. at 831. See also Perkins v. Matthews, 400 U.S. 379, 385, 91 S.Ct. 431, 27 L.Ed.2d 476 (1971); South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 335, 86 S.Ct. 803.

106. Allen v. State Bd. of Elections, *supra* note 102, 393 U.S. at 556, 89 S.Ct. at 826.

107. See W. Christopher, Constitutionality of the Voting Rights Act of 1965, 18 Stan.L. Rev. 1 (1965); A. Derfner, Racial Discrimination and the Right to Vote, 26 Vand.L. Rev. 523, 547–52 (1973); Note, Voting Rights Act of 1965, 1966 Duke L.J. 463.

108. "(a) To assure that the right of citizens of the United States to vote is not denied or abridged on account of race or color, no citizen shall be denied the right to vote in any Federal, State, or local election because of his failure to comply with any test or device in any State with respect to which the determinations have been made under subsection (b) of this section or in any political subdivision with respect to which such determinations have been made as a separate unit, unless the United States District Court for the District of Columbia in an action for a declaratory judgment brought by such State or subdivision against the United States has determined that no such test or device has been used during the ten years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color: *Provided,* That no such declaratory judgment shall issue with respect to any plaintiff for a period of ten years after the entry of a final judgment of any court of the United States, other than the denial of a declaratory judgment under this section, whether entered prior to or after the enactment of this subchapter, determining that denials or abridgments of the right to vote on account of race .or color through the use of such tests or devices have occurred anywhere in the territory of such plaintiff.

"An action pursuant to this subsection shall be heard and determined by a court of three judges in accordance with the provisions of section 2284 of Title 28 and any appeal shall lie to the Supreme Court. The court shall retain jurisdiction of any action pursuant to this subsection for five years after judgment and shall reopen the action upon motion of the Attorney General alleging that a test or device has been used for the purpose or with the effect of denying or abridging the right to vote on account of race or color.

"If the Attorney General determines that he has no reason to believe that any such test or device has been used during the ten years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color, he shall consent to the entry of such judgment.

"(b) The provisions of subsection (a) of this section shall apply in any State or in any political subdivision of a state which (1)

4 has been extended to any other state or political subdivision with respect to which similar determinations are made as to the year 1968.[109] The words "test or device" are defined as "any requirement that a person as a prerequisite for voting or registration for voting (1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class."[110] A state or local unit thus covered may reinstate the test or device only by bringing an action in this court for a declaratory judgment and obtaining a determination "that [no] such test or device has been used during the ten years preceding the filing of the action for the purpose or with the effect of denying or abridging the right to vote on account of race or color."[111]

It is to the states and political subdivisions which are covered by Section 4 that the prohibition of Section 5 applies. Section 5 provides that no person shall be denied the vote for failure to comply with "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect" in the covered state or subdivision on November 1, 1964, or November 1, 1968, as the case may be, unless and until (a) the change is submitted to the Attorney General and he interposes no objection, or (b) in an action instituted in this court, a judgment is obtained declaring "that such qualification, prerequisite, standard, practice, or procedure does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color. . . ."[112]

The reason for including the proscription of Section 5 in the Act is simple.

the Attorney General determines maintained on November 1, 1964, any test or device, and with respect to which (2) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1964, or that less than 50 per centum of such persons voted in the presidential election of November 1964. On and after August 6, 1970, in addition to any State or political subdivision of a State determined to be subject to subsection (a) of this section pursuant to the previous sentence, the provisions of subsection (a) of this section shall apply in any State or any political subdivision of a State which (i) the Attorney General determines maintained on November 1, 1968, any test or device, and with respect to which (ii) the Director of the Census determines that less than 50 per centum of the persons of voting age residing therein were registered on November 1, 1968, or that less than 50 per centum of such persons voted in the presidential election of November 1968.

"A determination or certification of the Attorney General or of the Director of the Census under this section or under section 1973d or 1973k of this title shall not be reviewable in any court and shall be effective upon publication in the Federal Register.

"(c) The phrase 'test or device' shall mean any requirement that a person as a prerequisite for voting or registration for voting

(1) demonstrate the ability to read, write, understand, or interpret any matter, (2) demonstrate any educational achievement or his knowledge of any particular subject, (3) possess good moral character, or (4) prove his qualifications by the voucher of registered voters or members of any other class.

"(d) For purposes of this section no State or political subdivision shall be determined to have engaged in the use of tests or devices for the purpose or with the effect of denying or abridging the right to vote on account of race or color if (1) incidents of such use have been few in number and have been promptly and effectively corrected by State or local action, (2) the continuing effect of such incidents has been eliminated, and (3) there is no reasonable probability of their recurrence in the future." Voting Rights Act of 1965, § 4, as amended, 42 U. S.C. § 1973b (1970).

109. *Id.* § 4(b), as amended, 42 U.S.C. § 1973b(b) (1970), quoted *supra* note 108.

110. *Id.* § 4(c), as amended, § 1973b(c) (1970), quoted *supra* note 108.

111. *Id.* § 4(a), as amended, 42 U.S.C. § 1973b(a) (1970), quoted *supra* note 108. See Gaston County v. United States, 395 U. S. 285, 89 S.Ct. 1720, 23 L.Ed.2d 309 (1969).

112. See note 19, *supra*.

As the Supreme Court has explained, "Congress knew that some of the States covered by § 4(b) of the Act had resorted to the extraordinary strategem of contriving new rules of various kind for the sole purpose of perpetuating voting discrimination in the face of adverse federal decrees."[113] Moreover, as the Court continued, "Congress had reason to suppose that these States might try similar maneuvers in the future in order to evade the remedies for voting discrimination contained in the Act itself."[114] So, said the Court, "[u]nder the compulsion of these unique circumstances, Congress responded," through the enactment of Section 5, "in a permissibly decisive manner."[115] The decisiveness of that response is apparent both from the wide coverage that Section 5 was given and from the caliber of the showing prerequisite to removal of its bar.

## IV. THE SCOPE OF SECTION 5

### A. *Coverage*

Since August 7, 1965, the State of Louisiana, in consequence of appropriate administrative determinations, has fallen within the ambit of Section 4 of the Voting Rights Act.[116] Since the State has not exempted itself from the coverage of Section 4, the City of New Orleans remains subject to the commands of Section 5.[117] The latter section requires clearance either by the Attorney General or by this court of "any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect" on November 1, 1964.[118] The redistricting plan which is the subject of this litigation will change a number of boundaries of the five councilmanic districts in New Orleans from what they were on that date. The Attorney General has interposed an objection to the plan, and the question is whether, on the evidence tested by the standard enunciated in Section 5, the plan merits our approval.

Indubitably, the enactment of the ordinance adopting Plan II triggered Section 5 into operation. As the Supreme Court has admonished, "Congress intended that the Act be given 'the broadest possible scope' to reach 'any state enactment which altered the election law of a covered State in even a minor way' "; [119] "all changes no matter how small [are to] be. subjected to § 5 scrutiny." [120] The reconstitution of councilmanic districts which the plan envisions is clearly a change of a "standard, practice, or procedure with respect to voting." [121] As such, it falls plainly within the purview of Section 5.[122]

113. South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 335, 86 S.Ct. at 822.

114. *Id.*

115. *Id.* See, to the same effect, Allen v. State Bd. of Elections, *supra* note 102, 393 U.S. at 548, 89 S.Ct. 817 ; Perkins v. Matthews, *supra* note 105, 400 U.S. at 389, 91 S.Ct. 431.

116. 30 Fed.Reg. 14505 (1965).

117. See Voting Rights Act of 1965, §§ 4 and 5, as amended, 42 U.S.C. §§ 1973b and 1973c (1970), quoted *supra* notes 102 and 19. See also Perkins v. Matthews, *supra* note 105, 400 U.S. at 394–396, 91 S.Ct. 431 ; Allen v. State Bd. of Elections, *supra* note 102, 393 U.S. at 554–556, 89 S.Ct. 817.

118. See note 19, *supra.*

119. Perkins v. Matthews, *supra* note 105, 400 U.S. at 387, 91 S.Ct. at 436, quoting Allen v.

State Bd. of Elections, *supra* note 102, 393 U.S. at 566, 567, 89 S.Ct. 817. See also Georgia v. United States, 411 U.S. 526, 532, 93 S.Ct. 1702, 36 L.Ed.2d 472 (1973).

120. Allen v. State Bd. of Elections, *supra* note 102, 393 U.S. at 568, 89 S.Ct. at 833. See also Georgia v. United States *supra* note 119, 411 U.S. at 532, 93 S.Ct. 1702 ; Perkins v. Matthews, *supra* note 105, 400 U.S. at 387, 91 S.Ct. 431.

121. Georgia v. United States, *supra* note 119, 411 U.S. at 531–535, 93 S.Ct. at 1706 ; Perkins v. Matthews, *supra* note 105, 400 U.S. at 388, 91 S.Ct. 431.

122. Compare Georgia v. United States, *supra* note 119, 411 U.S. at 531–535, 93 S.Ct. 1702 ; Perkins v. Matthews, *supra* note 105, 400 U.S. at 387–395, 91 S.Ct. 431 ; Allen v. State Bd. of Elections, *supra* note 102, 393 U.S. at 550–553, 569–571, 89 S.Ct. 817.

But to say that Section 5 is actuated by a plan proposing such a change is not to suggest that Section 5 demands disapprobation of the plan. It is to say that the plan must be disapproved unless the evidence warrants a judgment declaring that it "does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color." [123] That is the question which we are summoned to decide in this case.

## B. *Relationship to the Fifteenth Amendment*

In considering whether the New Orleans redistricting plan passes muster under Section 5, we must bear in mind the relationship of the Voting Rights Act to the Fifteenth Amendment. The Act, in its preamble, is declared to be legislation "[t]o enforce the fifteenth amendment to the Constitution of the United States, and for other purposes." [124] In Section 2 the Act, similarly to the Amendment, specifies that "[n]o voting qualification or prerequisite to voting, or standard, or practice, or procedure shall be imposed or applied by any State or political subdivision to deny or abridge the right of any citizen of the United States to vote on account of race or color." [125] The legislative history of the Act establishes the full and firm allegiance of its own objectives with the goals of the Amendment. [126] The Supreme Court summed it up when it observed that "[t]he Act was drafted to make the guarantees of the Fifteenth Amendment finally a reality for all citizens." [127]

■ This close relationship, so true of the Act as an entirety, is also true of Section 5. That section "essentially freezes the election laws of the covered States unless a declaratory judgment is obtained in [this court] holding that a proposed change is without discriminatory purpose or effect." [128] Like other provisions of the Act, Section 5 was passed, [129] and its validity has been sustained, [130] as an appropriate exercise of congressional power to enforce the mandate of the Fifteenth Amendment. [131] Section 5 proceeds to accomplish that mission through a substantially similar mandate of its own. The Amendment, in Section 1, provides in part that "[t]he right . . . to vote shall not be *denied* or *abridged* by . . . any State on account of race [or] color"; [132] in parallel language, Section 5 permits judicial approval of a changed voting procedure only if it "does not have the purpose and will not have the effect of *denying* or *abridging* the right to vote

---

123. See note 19, *supra*. See also Georgia v. United States, *supra* note 119, 411 U.S. at 529, 93 S.Ct. 1702; Perkins v. Matthews, *supra* note 105, 400 U.S. at 383–385, 91 S.Ct. 431; Allen v. State Bd. of Elections, *supra* note 102, 393 U.S. at 558–559, 89 S.Ct. 817; City of Petersburg v. United States, *supra* note 5, 354 F.Supp. at 1027.

124. 79 Stat. 437 (1965). See also H.Rep.No. 439, 89th Cong., 1st Sess. 6 (1965), U.S. Code Cong. & Admin.News 1965, p. 2437.

125. 42 U.S.C. § 1973 (1970).

126. See Part III(B), *supra*.

127. Allen v. State Bd. of Elections, *supra* note 102, 393 U.S. at 556, 89 S.Ct. at 826. See also South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 308, 309, 86 S.Ct. 803. "Hopefully, millions of non-white Americans will now be able to participate for the first time on an equal basis in the government under which they live. We may finally look forward to the day when truly '[t]he right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color, or previous condition of servitude.' " *Id.* at 337, 86 S.Ct. at 823.

128. Georgia v. United States, *supra* note 119, 411 U.S. at 538, 93 S.Ct. at 1769.

129. South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 308–316, 334–335, 86 S.Ct. 803.

130. Georgia v. United States, *supra* note 119, 411 U.S. at 535, 93 S.Ct. 1702. See also Allen v. State Bd. of Elections, *supra* note 102, 393 U.S. at 556, 89 S.Ct. 817; South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 323–337, 86 S.Ct. 803.

131. See Part III(B), *supra*.

132. Emphasis added.

on account of race, or color."[133] Judicial clearance of a new voting rule under Section 5 thus exacts "a judicial determination that continued suspension of the new rule is unnecessary to vindicate rights guaranteed by the Fifteenth Amendment." [134]

## C. Dilution of the Right to Vote

██ The clearest case of violation of the Fifteenth Amendment right arises, of course, when a would-be voter is barred from exercising it;[135] and there is no indication that the redistricting plan proposed for New Orleans will have that effect upon any voter. But both the Fifteenth Amendment and the Voting Rights Act forbid abridgment of the right to vote as well as its outright denial,[136] and any doubt as to what abridgment of the right encompasses may readily be dispelled. The Supreme Court held in Reynolds v. Sims,[137] a reapportionment case, and has later consistently repeated in cases arising under the Act,[138] that "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise."[139] As the Court has stated it another way with specific reference to the Act, "[t]he right to vote can be affected by a

dilution of voting power as well as by an absolute prohibition on casting a ballot." [140] And the Court has declared that by passage of the Act "Congress intended to adopt the concept of voting articulated in Reynolds v. Sims, . . . [to] protect Negroes against a dilution of their voting power."[141]

██ Our investigation as to whether the redistricting plan before us has a dilutive effect on the black vote in New Orleans is greatly assisted by a pause to briefly examine theory and practice prevalent in legislative reapportionment cases, wherein essentially the same problem has arisen. It is now settled that "[t]he Equal Protection Clause [of the Fourteenth Amendment] demands no less than substantially equal state representation for all citizens, of all places as well as of all races."[142] When the same number of representatives on the same body are elected from districts having disparate populations, the individual votes of citizens in the more heavily populated districts obviously have less weight than the votes of those in the districts more sparsely populated. For state elections conducted on the basis of districting, the general requirement is "substantial equality of population among the various districts, so that the vote of any citizen is approximately

---

133. See note 19, *supra* (emphasis added).

134. South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 335, 86 S.Ct. at 822.

135. See cases cited *supra* notes 89–93. "The abstract right to vote means little unless the right becomes a reality at the polling place on election day." Perkins v. Matthews, *supra* note 105, 400 U.S. at 387, 91 S.Ct. at 436.

136. See text *supra* at notes 125–33.

137. 377 U.S. 533, 84 S.Ct. 1362, 12 L.Ed.2d 506 (1964).

138. See Georgia v. United States, *supra* note 119, 411 U.S. at 532, 93 S.Ct. 1702; Perkins v. Matthews, *supra* note 105, 400 U.S. at 388, 91 S.Ct. 431; Allen v. State Bd. of Elections, *supra* note 102, 393 U.S. at 569, 89 S.Ct. 817.

139. Reynolds v. Sims, *supra* note 137, 377 U.S. at 555, 84 S.Ct. at 1378.

140. Allen v. State Bd. of Elections, *supra* note 102, 393 U.S. at 569, 89 S.Ct. at 833.

141. Perkins v. Matthews, *supra* note 105, 400 U.S. at 390, 91 S.Ct. at 438, quoting Allen v. State Bd. of Elections, *supra* note 102, 393 U.S. at 588, 89 S.Ct. 817 (separate opinion of Harlan, J.).

142. Reynolds v. Sims, *supra* note 137, 377 U.S. at 568, 84 S.Ct. at 1385. The cases supporting this proposition are legion. See, *e. g.*, Gaffney v. Cummings, 412 U.S. 735, 93 S.Ct. 2321, 37 L.Ed.2d 298 (1973); Mahan v. Howell, 410 U.S. 315, 93 S.Ct. 979, 35 L. Ed.2d 320 (1973); Abate v. Mundt, 403 U.S. 182, 91 S.Ct. 1904, 29 L.Ed.2d 399 (1971); Swann v. Adams, 385 U.S. 440, 87 S.Ct. 569, 17 L.Ed.2d 501 (1967); and cases cited at note 145, *infra*.

equal in weight to that of any other citizen in the State." [143]

Our commission in this case does not extend to this kind of malapportionment, but to conditions that might detrimentally affect the franchise on the basis of race or color.[144] Sometimes, however, in reapportionment situations devoid of any vitiating deviation from population equality, the claim is made that something in the voting scheme—in the decided cases, a multimember district or at-large voting—operates to sap the voting strength of racial or other minorities within the district.[145] The methodology of resolving such claims is instructive.

■ The Supreme Court has held that in such cases "the plaintiff['s] burden [146] is to produce evidence to support findings that the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents of the district to participate in the political processes and to elect legislators of their choice." [147] Thus, as the Fifth Circuit has pointed out, "although population is the proper measure of equality in apportionment, . . . access to the political process and not population

[is] the barometer of dilution of minority voting strength." [148] The determination demanded in such cases is to be made on "the totality of the circumstances," [149] and among the factors pertinent to the question whether a minority group enjoys meaningful access "are the continuing effects of past discrimination on the minority group's ability to participate in the political process, the opportunity for the minority group to participate in the candidate selection process, the responsiveness of elected officials to the particular concerns of the minority group, and the strength of the state interest in multimember or at-large voting." [150]

■ Our examination of New Orleans' redistricting, then, may proceed on several fundamental premises. The tendered issues are whether the City's Plan II will have the purpose or effect of abridging the right to vote because of race or color.[151] The decision necessitates prior investigation to ascertain whether the plan will attenuate, in terms of power or weight, the black vote in councilmanic elections.[152] The measure of the plan's validity is equality of opportunity, and the crucial inquiry is whether the plan leaves black citizens at liberty to participate in the electoral processes on the same plane with white

---

143. Reynolds v. Sims, *supra* note 137, 377 U.S. at 579, 84 S.Ct. at 1390. Since we are concerned with but one branch of the "one man, one vote" doctrine, we do not embark upon a consideration of its numerous ramifications.

144. See Beer v. United States, *supra* note 6, 374 F.Supp. 360–362.

145. See White v. Regester, 412 U.S. 755, 765–770, 93 S.Ct. 2332, 37 L.Ed.2d 314 (1973) ; Whitcomb v. Chavis, 403 U.S. 124, 143–144, 149, 91 S.Ct. 1858, 29 L.Ed.2d 363 (1971) ; Burns v. Richardson, 384 U.S. 73, 88, 86 S.Ct. 1286, 16 L.Ed.2d 376 (1966) ; Fortson v. Dorsey, 379 U.S. 433, 439, 85 S. Ct. 498, 13 L.Ed.2d 401 (1965) ; Turner v. McKeithen, 490 F.2d 191 (5th Cir. 1973) ; Zimmer v. McKeithen, 485 F.2d 1297 (5th Cir. en banc 1973) ; Howard v. Adams County Bd. of Supervisors, 453 F.2d 455, 457 (5th Cir.), cert. denied, 407 U.S. 925, 92 S.Ct. 2461, 32 L.Ed.2d 812 (1972).

146. The burden of proof which the Court speaks of is the burden in cases wherein relief is sought on constitutional grounds. As to the burden of proof in § 5 cases, see Part VI(B), *infra*.

147. White v. Regester, *supra* note 145, 412 U.S. at 766, 93 S.Ct. at 2339.

148. Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1303.

149. White v. Regester, *supra* note 145, 412 U.S. at 769, 93 S.Ct. 2332. See also Turner v. McKeithen, *supra* note 145, 490 F.2d at 194; Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305.

150. Turner v. McKeithen, *supra* note 145, 490 F.2d at 194.

151. See text *infra* at Part V.

152. See text *infra* at Part VI.

citizens.[153] That assessment, toward which we now proceed, is to be made upon careful consideration of all relevant circumstances.[154]

## V. THE LEGAL PROBLEM

To fulfill the mandate of Section 5, we repeat, it must be shown that the redistricting plan in question does not have the purpose and will not have the effect of denying or abridging the right to vote on account of race or color.[155] The burden of that showing rests upon New Orleans.[156] Our task is to determine whether that burden has been discharged,[157] and that is the only function we have with respect to the controversy at hand.[158]

### A. *The Prime Factors*

Several prominent factors, proceeding from quite different sources, converge to intensify the problem confronting us. One is the size and voting strength of the black community in New Orleans,[159] which expectably would assure the prospect of fairly substantial black representation on the City Council. At the same time the black minority, which numerically is nearly half of the total population, commands only slightly

more than one-third of the vote, a circumstance that beckons inquiry as to why that is so. Another factor of great moment is the residential pattern prevalent in the city.[160] When the five councilmanic districts are constructed vertically—by dividing lines drawn northwardly and southwardly across the entire city—it is difficult to avoid the result that each district will combine a segment of the east-west black belt with segments of contiguous white areas. Rather, the likely result is all or nearly all districts with a preponderance of white inhabitants and voters.[161]

Other vital factors are important elements of the political machinery by which the City Council is chosen. Five of the seven members are elected from the five single-member districts and the other two from the city at large.[162] Nomination as a candidate for election requires a majority of the vote cast at a primary,[163] and singleshot voting in primaries is not allowed.[164] These features of the electoral process operate conjunctively to handicap a racial minority, wherever and whenever it is also a voting minority, from securing nomination of its candidates if the voting proceeds strictly along racial lines. In New Orleans it usually does,[165] and nomination in

---

153. See text *infra* at Part VII.

154. See text *infra* at Part V(A).

155. See Parts III(B), (C), IV(B), (C), *supra*.

156. We discuss the burden of proof in § 5 cases in Part VI(B), *infra*.

157. See Beer v. United States, *supra* note 6, 374 F.Supp. at 360–362.

158. *Id.*

159. See Part I(A), *supra*.

160. See Part I(A), *supra*.

161. Compare the analysis of the Attorney General, Part I(B), *supra*, and note 33, *supra*. We do not suggest that vertically-drawn district lines may not appropriately be incorporated into a redistricting scheme for New Orleans, nor that only an east-west configuration could satisfy Section 5. It is not within our power to draw new lines; our function extends merely to identification

of the visible defects in the plan as submitted which work to dilute the black vote.

162. New Orleans, La., Charter art. III, § 3–102 (1954). See Part II(B), *supra*.

163. La.Rev.Stats.Ann. art. 18, § 358 (1966 supp.).

164. *Id.* art. 18, § 351 (1966 supp.), which reads:

Whenever in any political district or political subdivision there are two or more offices of the same kind of character to be elected, . . . each elector shall vote for as many candidates as there are places to be filled. Whenever an elector shall vote for a lesser number of candidates than there are places to be filled, the ballot shall not be counted for any one of the plural candidates voted for thereon, but shall be considered and counted as if no one of the plural candidates had been voted for. . . .

165. See Part II(B), *supra*.

the Democratic primary is usually tantamount to victory in the general election.[166]

It is in this general context, further ramified by additional considerations, that the redistricting proposed by Plan II must be examined. The plan changes a number of boundaries of the five preexisting vertical councilmanic districts, but leaves the districts just as vertical as they were before. When the plan is superimposed upon the housing pattern prevalent in New Orleans, the statistical picture in the five districts emerges as follows:

| District | Population | | | Registered Voters | | |
|---|---|---|---|---|---|---|
| | Total | Black | % | Total | Black | % |
| A | 117,901 | 36,665 | 29.1 | 57,387 | 12,964 | 22.6 |
| B | 118,678 | 76,109 | 64.1 | 39,870 | 20,976 | 52.6 |
| C | 119,023 | 42,651 | 35.8 | 49,756 | 11,606 | 23.3 |
| D | 118,337 | 51,447 | 43.5 | 49,505 | 18,223 | 36.8 |
| E | 119,532 | 60,437 | 50.6 | 45,898 | 19,819 | 43.2 |
| Total | 593,471 | 267,308 | 45.0 | 242,416 | 83,588 | 34.5 |

Thus only in one district—District B—would there be a majority of black voters, and a slim majority at that. Two seats on the Council would be filled by the at-large vote, and the majority- and multiple-vote requirements for primaries would remain.

### B. *Purpose of the Plan*

On the issue of the purpose—as to black voting—that engendered the redistricting scheme projected by Plan II, New Orleans has submitted extensive testimony by six members of its City Council and three members of the Council's research staff as to the factors they respectively considered and evaluated in the course of the formulative process. Credible evidence supports the City's assertion that compliance with the call of the city charter for councilmanic redistricting after decennial censuses[167] was the prime motivation in the evolution of the plan. In sum, the City asserts that the factors instrumental in the shaping of Plan II were population, boundaries—natural, historical and political, compactness of districts and avoidance of minority-vote dilution.[168] The City insists that the planners were not prompted by any desire to discriminate against any group of residents on the basis of race or color in the promulgation of the plan.

The Government concedes that the bare statistical output of Plan II,[169] taken in a vacuum, does not necessarily establish that the plan is racially discriminatory in aim. To rebut the City's evidence, the Government, joined by the intervenors, suggests that the planners were unpardonably insensitive to the consequences of redrawing the district lines through dense settlements of black population. The Government notes that though black families live throughout Orleans Parish, they are heavily concentrated in several areas comprising something of a chain extending eastwardly and westwardly across the city.[170] The contention is that the vertical north-south lines staking out the district boundaries established by Plan II have the purpose of discriminating against

166. Compare note 73, *supra*.

167. See note 18, *supra*.

168. See Part VI(B), *infra*.

169. See Part V(A), *supra*.

170. See Part I(A), *supra*.

black voters since they obviously carve up major black neighborhoods which follow a horizontal east-west progression.

▉▉▉ As additional support for its claim of improper motive, the Government points to evidence tending to show a conscious effort by the planners to preserve, as far as possible, the existing districts—represented, of course, by incumbent councilmen.[171] The Government also endeavors to bolster its argument by reference to the long history of past racial discrimination in New Orleans.[172] The Government hastens to remind us that the City has the burden of proof on the issue,[173] and that neither the Government nor the intervenors are required to come forward with an affirmative showing thereon.

Such, in brief summary, is the posture of the evidence directed toward the issue of purpose of Plan II, an issue, however, which we have no occasion to decide. New Orleans, we reiterate, bears the burden of proving that the plan is untainted by racial discrimination, not only in its objective but also in its potential effect.[174] For reasons we elaborate in the remainder of this opinion, we find that Plan II will have the effect of abridging the right to vote on account of race or color.[175] So concluding, we need not ponder whether the framers of the plan intended that result to follow.

## C. *Effect of the Plan*

▉▉▉ In assessing the effect of Plan II upon the black vote in councilmanic elections in New Orleans,[176] the initial step is a comparison of (a) the potential of that vote when uninhibited by artificial barriers with (b) the potential the vote will have once the plan joins the family of procedures for voting at such elections. This starting point is dictated by considerations fundamental to the technique of ascertaining whether in any situation the right to vote has been abridged. The Constitution outlaws any electoral scheme which is "used invidiously to cancel out or minimize the voting strength of racial groups,"[177] and Section 5 bars approval of any scheme which will have that effect.[178] Dilution—a species of abridgment—of the right to vote[179] is necessarily gauged by the difference between the value—the weight—which the vote should have and the value which in the particular circumstances it really has.[180]

171. Preservation of incumbents' districts is not automatically a disqualifying consideration. See White v. Weiser, 412 U.S. 783, 791, 93 S.Ct. 2348, 37 L.Ed.2d 335 (1973); Burns v. Richardson, *supra* note 145, 384 U.S. at 89 n. 16, 86 S.Ct. 1286. Nonetheless, it is an element to be viewed in the complex of motivating forces.

172. See Part VII(C), *infra*.

173. See Part VI(B), *infra*.

174. See text *supra* at note 123; Parts III(B), (C), IV(B), (C), *supra*, and Part VI(B), *infra*.

175. Parts VI–VIII, *infra*.

176. Inquiry as to the effect of the plan upon the right to vote properly extends to any councilmanic election—primary or general, regular or special. "[T]he Act gives a broad interpretation to the right to vote," Allen v. State Bd. of Elections, *supra* note 102, 393 U.S. at 565–566, 89 S.Ct. at 832:
 The terms "vote" or "voting" shall include all action necessary to make a vote effective in any primary, special, or general election, including, but not limited to, registration, listing pursuant to this subchapter, or other action required by law prerequisite to voting, casting a ballot, and having such ballot counted properly and included in the appropriate totals of votes cast with respect to candidates for public or party office and propositions for which votes are received in an election.
Voting Rights Act of 1965, § 14(c)(1), 42 U.S.C. § 1973l(c)(1) (1970).

177. White v. Regester, *supra* note 145, 412 U.S. at 765, 93 S.Ct. at 2339. See also Turner v. McKeithen, *supra* note 145, 490 F.2d at 196–197; Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1304.

178. See Parts III(B), (C), IV(B), (C), *supra*.

179. See Part IV(C), *supra*.

180. See Part IV(C), *supra*. The point is well illustrated in many cases wherein claims of population malproportionment for state elections are advanced. The standard in such cases, dictated by the Equal Protection Clause of the Fourteenth Amendment, is

In determining the impact of a redistricting plan upon the voting capability of a racial minority, the relevant comparison is between the results which the minority is constitutionally free to command and the results which the plan leaves the minority able to achieve.[181] A substantial difference between the two, not justified by a compelling governmental interest, is unconstitutionally enervating.[182] Moreover, a plan which unjustifiably curtails the voting power of one racial group more severely than the power of another similarly situated group is patently discriminatory.[183] The value to which the New Orleans black vote is legally entitled is "a theoretical optimum designed to give fair representation to both minority and majority groups in the City";[184] and the test of the plan proposed for New Orleans is whether on the one hand it indulges or on the other hand forecloses the opportunity for that brand of representation.

When we apply these standards to the case at bar, we can conclude only that Plan II will necessarily dilute the right of black citizens to vote in councilmanic elections held thereunder in New Orleans. We find that the inexorable consequence of the plan will be a drastic reduction in the voting strength of the black minority in such elections. We are brought to that finding irrespective of whether, for purposes of decision, we assess black voting strength in New Orleans at the level of black voter registration[185] or on the basis of black population,[186] or whether from either viewpoint we examine the plan simply in light of the extrinsic requirement of at-large elections for two seats.[187] As this opinion reflects, we have approached the problem from each of these three directions, and in each instance we have reached the same result.[188]

## VI. DILUTION OF PRESENT BLACK VOTING STRENGTH

### A. The Facts

Taking the power of the black vote in New Orleans merely for what it now is, as distinguished from what if historically unsuppressed the black vote actually should be,[189] it may nonetheless be readily discerned that the City's redistricting plan would diminish markedly the potency of that vote in councilmanic elections.

Based upon voter registration, black voting strength is 34.5% of total voting strength in New Orleans.[190] With seven members to be nominated or elected at councilmanic elections, the power of the black vote is theoretically equivalent to 2.42 seats on the Council.[191] While the measurement of group voting strength and of its dilution is a matter of com-

"one man, one vote" substantially equal in weight to the votes of all other electors. The ideal is perfect equality, and dilution is the degree to which one man's vote is unjustifiably assigned a value less than full equality. Unconstitutionality of the apportionment plan may result from too great a difference between the actual weight of particular votes and the theoretical quality of the ideal. Reynolds v. Sims, *supra* note 137, 377 U.S. at 568, 577–579, 84 S.Ct. 1362. See Whitcomb v. Chavis, *supra* note 145, 403 U.S. at 161–163, 91 S.Ct. 1858; Swann v. Adams, *supra* note 142; Kilgarlin v. Hill, 386 U.S. 120, 87 S.Ct. 820, 17 L.Ed.2d 771 (1967). Compare White v. Regester, *supra* note 145; Gaffney v. Cummings, *supra* note 142; Mahan v. Howell, *supra* note 142.

181. See Part IV(C), *supra*.

182. See Part VI(B), *infra*.

183. See cases cited *supra* note 180.

184. Dobson v. Mayor & City Council of Baltimore City, 330 F.Supp. 1290, 1299 (D.Md. 1971).

185. See text *supra* at note 10.

186. See text *supra* at notes 10–11.

187. See text *supra* at note 13.

188. See Parts VI, VII, VIII, *infra*.

189. We consider the plan from the latter viewpoint in Part VII, *infra*.

190. See Part V(A), *supra*.

191. That is, 34.5% of the seven seats. Compare Dobson v. Mayor & City Council of Baltimore City, *supra* note 184, 330 F.supp. at 1298–1299.

paring potentials,[192] the practice of bloc voting along racial lines which so frequently pervades elections in New Orleans [193] would expectably bring the black and white voting potentials fairly close to reality.

Under redistricting Plan II, however, the strength of the black vote would be much lower than its 34.5% potential. This becomes apparent when the plan is viewed, as it must be, in the whole of the context in which it would operate.[194] Two members of the Council would be elected from the city at large, and each of the others from one of the five councilmanic districts.[195] Nominations of candidates for councilmanic office at primary elections would require majority vote,[196] and singleshot voting would be taboo.[197] With black voting power at 34.5% of total voting power, black citizens in New Orleans are a distinct minority on a citywide basis. Under Plan II, they are also the minority in four of the five councilmanic districts, wherein black registered voters are confined to a range of 22.6% to 43.2% of the district totals.[198] Only in District B, where they would reach 52.6%,[199] is black voting strength theoretically self-sufficient to elect a candidate and, the thinness of the margin considered, only doubtfully so.[200]

Thus analyzed, Plan II, operating conjunctively with existent features of the New Orleans scheme for the election of councilmen, would limit the capability of the black vote to but one of the seven seats on the Council. This contrasts sharply with the black vote's theoretical equivalent of 2.42 seats,[201] and with the artificial gain of the white vote to 6.00 seats from its theoretical equivalent of 4.58 seats.[202] These deviations are the consequence of fragmentation of the black vote for the five district seats and its compartmentation in districts so constructed that it attains a majority status in only one, in cooperation with the phenomena of at-large elections for the two remaining seats, and majority- and multiple-vote prerequisites to candidacy for any seat. It cannot be doubted that the reduction in the strength of the black vote from its natural potential of 2.42 seats to an actual equivalent of a dubious one seat is a dilution in every sense of the word.[203] Nor can it be gainsaid that Plan II would lay a much heavier hand upon New Orleans' black minority than upon its white majority.[204]

We wish to make it plain that the question before us is not whether New Orleans must confer upon its black citizens every political advantage that a redistricting plan conceivably could offer. We agree that "a minority group is not constitutionally entitled to an apportionment structure designed to maximize its political advantage,"[205] nor "to one or more 'safe' or majority districts simply because an apportionment scheme could be drawn to reach this result."[206]

192. See Parts IV(C), V(C), *supra*.

193. See Part II(B), *supra*.

194. See Part V(C), *supra.*

195. See note 13, *supra*, and accompanying text.

196. See Parts II(B), V(A), *supra*.

197. See note 13, *supra*, and accompanying text.

198. See Part V(A), *supra*.

199. See Part V(A), *supra*.

200. Compare Dobson v. Mayor & City Council of Baltimore City, *supra* note 184, 330 F.Supp. at 1299.

201. See text *supra* at note 191.

202. That is, 65.5% of the seven seats.

203. See Kilgarlin v. Hill, *supra* note 180; Swann v. Adams, *supra* note 142; Lucas v. Forty-Fourth Gen. Assembly, 377 U.S. 713, 84 S.Ct. 1459, 12 L.Ed.2d 632 (1964); Roman v. Sincock, 377 U.S. 695, 84 S.Ct. 1449, 12 L.Ed.2d 620 (1964); Reynolds v. Sims, *supra* note 137; Ellis v. Baltimore, 352 F.2d 123 (4th Cir. 1965); Skolnick v. Chicago, 415 F.2d 1291 (7th Cir. 1969), cert. denied, 397 U.S. 954, 90 S.Ct. 984, 25 L.Ed.2d 138 (1970).

204. See, *e. g.*, notes 26 and 33, *supra*.

205. Turner v. McKeithen, *supra* note 145, 490 F.2d at 197.

206. *Id.* at 197 n. 24. See also Whitcomb v. Chavis, *supra* note 145, 403 U.S. at 156–160, 91 S.Ct. 1858; Howard v. Adams County

But just as surely, "neither may [the group] be enveloped in a structure which will necessarily minimize its potential for meaningful access to the political process." [207] The Government and the intervenors, as they should, press vigorously on behalf of black voters for all that is their due, but they ask for no more.

### B. *The Justifications Proffered*

The City urges a variety of considerations as legitimate local interests justifying the scheme incorporated into Plan II despite the damage it will inflict on the black vote. The justifications the City proffers are subsumed in a group of guidelines within which the research staff undertook the development of the several redistricting concepts which from time to time were submitted to the City Council.[208] For purposes of restatement, we adopt the City's listing, which accurately summarizes the evidence on that score.[209] The redistricting should be accomplished without diluting the voting rights of any minority group within the city. The object of the redistricting should be achievement, as nearly as possible, of a mathematical balance of population within each of the five councilmanic districts in order to insure compliance with the "one man, one vote" edict. Whenever possible, existing ward and precinct boundaries should be left undisturbed by district boundaries, and historic and traditional district boundaries should be observed in an effort to preserve continuity within the electorate. Natural boundaries created by the Mississippi River and Lake Pontchartrain, and the economic and social effect of the river and lake on the city, should be considered, as well as man-made boundaries existing in the form of important streets and canals, a majority of which run in a north-south direction. Prospective councilmanic districts should be contiguous and compact.

Since the redistricting activity in New Orleans sought a nearly equal population balance within the councilmanic districts, the local concerns reflected by the guidelines paralleled factors which have endured exposure in state legislative apportionment cases.[210] While population is the controlling criterion for judgment in controversies of that type,[211] mathematical exactness in redistricting is an impractical goal [212] and small departures from a mathematically precise "one man, one vote" standard may be indulged.[213] "So long as the divergences from a strict population standard are based on legitimate considerations incident to the effectuation of a rational state policy," the Supreme Court has said, "some deviations from the equal-population principle are constitutionally permissible."[214] But the validity of the apportionment depends upon "faithful adherence to a plan of population-based representa-

Bd. of Supervisors, *supra* note 145, 453 F.2d at 458.

207. Turner v. McKeithen, *supra* note 145, 490 F.2d, at 197. See also text *infra* at Parts VII and VIII.

208. See Parts II(A), (C), *supra*.

209. See Part II(A), *supra*.

210. Gaffney v. Cummings, *supra* note 142, 412 U.S. at 752, 93 S.Ct. 2321; Burns v. Richardson, *supra* note 145, 384 U.S. at 89 n. 16, 86 S.Ct. 1286. See White v. Regester, *supra* note 145, 415 U.S. at 764–765 n. 8, 93 S.Ct. 2332; Mahan v. Howell, *supra* note 142; and compare White v. Weiser, *supra* note 171, 412 U.S. at 791, 93 S.Ct. 2348 (minimize contests between incumbents); Abate v. Mundt, *supra* note 142, 403 U.S. at

185, 91 S.Ct. 1904 (maintain integrity of political subdivision lines); Whitcomb v. Chavis, *supra* note 145, 403 U.S. at 162 n. 42, 91 S.Ct. 1858 (construct contiguous-compact districts).

211. Reynolds v. Sims, *supra* note 137, 377 U.S. at 567, 84 S.Ct. 1362.

212. Roman v. Sincock, *supra* note 203, 377 U.S. at 710, 84 S.Ct. 1449; Reynolds v. Sims, *supra* note 137, 377 U.S. at 577, 84 S. Ct. 1362.

213. Roman v. Sincock, *supra* note 203, 377 U.S. at 710, 84 S.Ct. 1449; Reynolds v. Sims, *supra* note 137, 377 U.S. at 578–581, 84 S.Ct. 1362.

214. Reynolds v. Sims, *supra* note 137, 377 U. S. at 579, 84 S.Ct. at 1391.

tion," [215] and the departures allowable are "such minor deviations only as may occur in recognizing certain factors which are free from any taint of arbitrariness or discrimination." [216]

We do not underestimate the complexity of the difficulty of redistricting a large metropolitan area, nor do we denigrate the recognition in a reapportionment plan of legitimate local interests within the narrow range legally allowed. The evidence in this case, however, tends to weaken the group of interests which the City advances. The guidelines utilized by the staff were never deemed an absolute code, but rather a flexible mold enabling innovation and change. Examples of variations which the guidelines indulged are the various concepts submitted by the staff,[217] the contrasting treatments of Algiers,[218] the occasional splitting of wards and precincts,[219] and the free interchange of geographical phenomena.[220] The evidence indicates that the Council's second plan—the plan now under investigation—may have been as much the handiwork of councilmen as of the staff, with resultant uncertainty as to the extent that allegiance to the staff's guidelines was maintained. The evidence also discloses wide differences of opinion among the councilmen as to the relative priority and weight which the factors incorporated into the guidelines should be assigned. And, quite importantly, in some respects some of the factors may legally be open to question.[221]

We need not engage in a detailed discussion along these lines, however, because in any event the City's attempt at justification falls far short of the mark. "[A]ll legal restrictions which curtail the civil rights of a single racial group are immediately suspect,"[222] we are reminded, and "courts must subject them to the most rigid scrutiny."[223] Beyond that, the right to vote is "a fundamental political right, . . . pre-

215. Roman v. Sincock, *supra* note 203, 377 U.S. at 710, 84 S.Ct. at 1458.

216. *Id.;* Reynolds v. Sims, *supra* note 137, 377 U.S. at 579, 84 S.Ct. at 1390.

217. See Parts II(A), (C), *supra.*

218. Compare Part II(A) with Part II(C), *supra.*

219. In Louisiana, the division of parishes into wards served to establish geographical units for the election of police juries—governing bodies of the parishes—school boards and some local officers. In 1912, Orleans Parish had a commission form of local government, which functioned more as an administrative than a legislative body, and its territory, the boundaries of which are coterminous with the present City of New Orleans, was divided into wards principally for purposes of state and federal elections. Precinct lines were drawn as subdivisions within the wards for locating neighborhood voting booths and establishing voter group entities.

The adoption in 1954 of a home rule charter and the mayor-council form of government for New Orleans rendered obsolete the original function of the ward lines as regards municipal elections. Under the 1954 charter, the geographic boundaries for such elections are the district lines and not the ward lines.

Testimony from both councilmen and staff members stressed their concern for observing ward and precinct lines as traditional, historic political boundaries. It is clear, however, that the ward boundaries are political anachronisms insofar as councilmanic elections are concerned, and survive merely as convenient administrative designations for groups of precincts. And, in the formulation of Plan I, the Council's action in splitting the Fifteenth Ward—Algiers—three ways and assigning the pieces to three different districts undermined any assumed importance of keeping ward boundaries intact. Moreover, as the parties stipulated at trial, it is mathematically impossible to combine the existing wards in New Orleans in such a way as to achieve an equal population dispersion in five councilmanic districts.

220. See Part II(C), *supra.*

221. See Lucas v. Forty-Fourth Gen. Assembly, *supra* note 203, 377 U.S. at 738, 84 S. Ct. 1459, (history, heterogeneous characteristics, geographical and topographic considerations); Maryland Comm. for Fair Representation v. Tawes, 377 U.S. 656, 675, 84 S. Ct. 1429, 12 L.Ed.2d 595 (1964) (history, tradition); Reynolds v. Sims, *supra* note 137, 377 U.S. at 578–579, 84 S.Ct. 1362 (history).

222. Korematsu v. United States, 323 U.S. 214, 216, 65 S.Ct. 193, 194, 89 L.Ed. 194 (1944).

223. *Id.*

servative of all rights,"[224] and "before that right can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close constitutional scrutiny."[225]

Dilutions of the right to vote which are to be tested by the equal protection standard—which involves a balancing of competing governmental and private interests[226]—may withstand analysis upon a firm showing that they are rationally related to a permissible governmental interest.[227] But, the Supreme Court admonishes, "a more exacting test is required for any [governmental action] that 'place[s] a condition on the exercise of the right to vote.'"[228] In pursuing even the most substantial of its interests, government "cannot choose means which unnecessarily burden or restrict constitutionally protected activity."[229] So, "if a challenged statute grants the right to vote to some citizens and denies the franchise to others, 'the Court must determine whether the exclusions are *necessary* to promote a *compelling* state interest.'"[230] "And if there are other, reasonable ways to achieve [its] goals with a lesser burden on constitutionally protected activity, a State may not choose the way of greater interference[231]"; rather, "[i]f it acts at all, it must choose 'less drastic means'."[232] We have no doubt whatever that in light of the strictures of the Fifteenth Amendment,[233] the standard which justifications of denials of voting rights must meet applies equally to dilutions of those rights. Nor do we doubt that Section 5 of the Voting Rights Act accommodates any less than the Fifteenth Amendment demands.[234]

The question, then, is whether the City has satisfied the high standard of justification. We think it clear that the question must be answered in the negative. As the Supreme Court has recently stated, "[i]t is well established that in a declaratory judgment action under § 5, the plaintiff State has the burden of proof."[235] The Court explained:

> The very effect of § 5 was to shift the burden of proof with respect to racial discrimination in voting. Rather than requiring affected parties to bring suit to challenge every changed voting practice, States subject to § 5 were re-

224. Dunn v. Blumstein, 405 U.S. 330, 336, 92 S.Ct. 995, 999, 31 L.Ed.2d 274 (1972), quoting Reynolds v. Sims, *supra* note 137, 377 U.S. at 562, 84 S.Ct. 1362.

225. Evans v. Cornman, 398 U.S. 419, 422, 90 S.Ct. 1752, 1755, 26 L.Ed.2d 370 (1970). See also Dunn v. Blumstein, *supra* note 224, 405 U.S. at 336, 92 S.Ct. 995; Bullock v. Carter, 405 U.S. 134, 143, 92 S.Ct. 849, 31 L.Ed.2d 92 (1972).

226. See Gaffney v. Cummings, *supra* note 142, 412 U.S. at 748–749, 93 S.Ct. 2321; White v. Regester, *supra* note 145, 412 U.S. at 761–762, 93 S.Ct. 2332; Abate v. Mundt, *supra* note 142, 403 U.S. at 185, 91 S.Ct. 1904.

227. *E. g.,* Reynolds v. Sims, *supra* note 137, 377 U.S. at 568, 84 S.Ct. 1362.

228. Dunn v. Blumstein, *supra* note 224, 405 U.S. at 337, 92 S.Ct. at 1000, quoting Bullock v. Carter, *supra* note 225, 405 U.S. at 143, 92 S.Ct. 849.

229. Dunn v. Blumstein, *supra* note 224, 405 U.S. at 343, 92 S.Ct. at 1003.

230. *Id.* at 337, 92 S.Ct. at 1000, quoting Kramer v. Union Free School Dist., 395 U.S. 621, 627, 89 S.Ct. 1886, 23 L.Ed.2d 583 (1969). See also Cipriano v. City of Houma, 395 U.S. 701, 704, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969); City of Phoenix v. Kolodziejski, 399 U.S. 204, 205, 209, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970).

231. Dunn v. Blumstein, *supra* note 224, 405 U.S. at 343, 92 S.Ct. at 1003, quoting Shelton v. Tucker, 364 U.S. 479, 488, 81 S.Ct. 247, 5 L.Ed.2d 231 (1960).

232. *Id.*

233. See Parts III(A), IV(C), *supra.*

234. See Parts III, IV, *supra.*

235. Georgia v. United States, *supra* note 119, 411 U.S. at 538, 93 S.Ct. at 1709. See also City of Petersburg v. United States, *supra* note 5, 354 F.Supp. at 1027.

quired to obtain prior clearance before proposed changes could be put into effect. The burden of proof is on "the areas seeking relief."[236]

Even were we to assume that the justifications the City presses could ever override the right of its black citizens to cast meaningful votes—a question we in no wise undertake to now decide—the burden in the case at bar was at least to demonstrate that nothing but the redistricting proposed by Plan II was feasible.[237] The City has not made that sort of demonstration; indeed, it was conceded at trial that neither that plan nor any of its variations was the City's sole available alternative.

Moreover, it is clear enough to us that the interests which the City asserts here cannot justify a black voting-strength dilution of the magnitude which the plan forebodes. The reduction here, we repeat, is from 2.42 of seven seats at least to a single seat, and perhaps even to no seat at all.[238] That is a curtailment of the black vote to considerably less than half of its potential, if indeed not a complete negation of its potential. The Equal Protection Clause tolerates some limited accommodation of governmental interests at the expense of very minor dilution of the vote, but certainly nothing on the scale indicated here.[239] Surely the Fifteenth Amendment, which flatly enjoins all governments from denying or abridging the right to vote on account of race or color,[240] discountenances the abridgment evident in this case.

## VII. DILUTION OF POTENTIAL BLACK VOTING STRENGTH

### A. *The Question*

 We turn now to analyze New Orleans' redistricting Plan II from a somewhat different viewpoint. The inquiry here will be whether the plan will operate "invidiously to cancel out or minimize the voting strength of [the] racial group[]"[241] which the black citizens of the city comprise. We find that the plan will indeed have that effect.

In the previous section of this opinion, we saw that the proposed redistricting, in combination with other forces inhering in the processes by which councilmen are nominated and elected in New Orleans, will cut the strength of the city's black vote down to a point far below its present 34.5% potential as reflected by black voter registration.[242] Black population, however, is 45.0% of the city's total population,[243] and the theoretical entitlement of black population of that size on a seven-member elected body is 3.15 seats.[244] We have seen, however, that if the redistricting plan before us takes its place in the electorial scheme, it will indulge the black vote a theoretical equivalent of but one councilmanic seat,[245] and in a practical sense by only a narrow margin at that. Moreover, even if black voting power, in terms of voter registration, were directly proportional to black population, the two seats to be filled by the two districts in which black population preponderates[246]—albeit in one very narrowly[247]—are less than two-thirds of

---

236. Georgia v. United States, *supra* note 119, 411 U.S. at 538 n. 9, 93 S.Ct. at 1709, quoting South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 335, 86 S.Ct. 803.

237. See text *supra* at notes 235–36.

238. See Part VI(A), *supra.*

239. Compare cases cited at note 226, *supra.*

240. See Parts III(A), IV(C), *supra.*

241. White v. Regester, *supra* note 145, 412 U.S. at 765, 93 S.Ct. at 2339. See also Part IV(C), *supra.*

242. See Part VI(A), *supra.*

243. See Part I(A), *supra.*

244. That is, 45% of the seven seats.

245. See Part VI(A), *supra.*

246. Districts B and E. See text *supra* at Part V(A).

247. The preponderance of black population in District E is only 0.6%. See Part V(A), *supra.* Compare Dobson v. Mayor and City Council of Baltimore City, *supra* note 184, 330 F.Supp. at 1299.

black entitlement.[248] Most importantly, any consideration, from the viewpoint of black population, of the effect of Plan II upon the black right to vote inevitably questions why the number of black registered voters lags so far behind the number of black inhabitants of New Orleans.[249]

Equality in weight of the vote, as well as in the right to cast a vote, is the constitutional due of black and white citizens alike.[250] "[P]opulation is the proper measure of equality in apportionment,[251]" and inequality visited because of race or color is an abridgement of the right to vote within the condemnation of the Fifteenth Amendment.[252] The question thus becomes whether, from the standpoint of black population rather than black voter registration, the black vote will be impermissibly impaired by Plan II. Restated somewhat, the question is whether the plan will dilute the voting power of the black community in terms of its full potential rather than its current level. In a very real sense, the dilution question subsumes the core question of why the rate of white voter registration is nearly double the rate of black registration.[253] For answers to these questions, there is a sizeable body of precedent which we may readily consult.[254]

## B. The Legal Doctrine

Dilution of the vote of a racial minority is not shown by "a mere disparity between the number of minority residents and the number of minority representatives,"[255] or by the fact "that the racial group allegedly discriminated against has not had legislative seats in proportion to its voting potential."[256] A claim of abridgement of the minority vote—from the viewpoint of the minority's full potential in the political arena —is meritorious only when it appears that "the political processes leading to nomination and election were not equally open to participation by the group in question—that its members had less opportunity than did other residents in the district to participate in the political processes and to elect legislators of their choice."[257] So, while "population is the proper measure of equality in apportionment, . . . access to the political process and not population [is] the barometer of dilution of minority voting strength."[258]

The investigation of this branch of the litigation calls for careful examination of a variety of circumstances.[259]

248. That is, 2.00 of 3.15 seats. See text *supra* at note 244.

249. Of 267,308 black residents of New Orleans, 83,588, or 34.5%, are registered voters. See text supra at Part II(A). On the other hand, 158,828, or 65.5% of 326,163 white residents of New Orleans are registered.

250. See Part IV(C), *supra*.

251. Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1303.

252. See Parts III(A), IV(C), *supra*.

253. See note 249, *supra*.

254. To resolve these questions, we pursue the inquiries and apply the principles approved in cases, hereinafter cited, involving claims that multimember electoral districts will unconstitutionally dilute the voting strength of a racial or ethnic group. Those decisions furnish precedents of the highest quality for cases like ours. The issues are identical—whether an electoral prerequisite or procedure improperly waters down the group's right to vote—and the investigation called for is essentially the same. The legal rules are no less commonly applicable simply because the problem is generated by a multimember district in the one situation and by a redistricting plan in the other. For an earlier decision of this court similarly applying these principles analogously, see City of Petersburg v. United States, *supra* note 5, 354 F.Supp. at 1028.

255. Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305.

256. White v. Regester, *supra* note 145, 412 U.S. at 765–766, 93 S.Ct. at 2339.

257. *Id.* at 766, 93 S.Ct. at 2339.

258. Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1303.

259. See Part II(B), *supra*.

Our decision must rest upon a delicate balance of all relevant factors.[260] Giving due attention and weight to those factors, we find that the plan for the redistricting of New Orleans will indubitably have the effect of minimizing the voting strength of black citizens in councilmanic elections.

### C. Application of Doctrine

■ We look first to the lengthy "history of official racial discrimination in [Louisiana], which at times touched the right of Negroes to register and vote and to participate in the democratic processes."[261] The pertinent historical events demonstrate not only "that blacks ha[ve] suffered a history of official racial discrimination which touched their right to participate in democratic processes,"[262] but also "that the existence of past discrimination in general precludes the effective participation in the elective system."[263]

For generations, black inhabitants of New Orleans were segregated in public schools,[264] public assemblies,[265] public recreational facilities,[266] public transportation,[267] and even in the city hall.[268] For a long time they were victimized by governmentally-sanctioned residential segregation,[269] and still longer by discrimination in public employment[270] and exclusion from

260. See text *supra* at notes 226–34.

261. White v. Regester, *supra* note 145, 412 U.S. at 766, 93 S.Ct. at 2339.

262. Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305. See also *id.* at 1306; White v. Regester, *supra* note 145, 412 U.S. at 766, 93 S.Ct. 2332; Turner v. McKeithen, *supra* note 145, 490 F.2d at 194, 194–195.

263. Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305.

264. See Bush v. Orleans Parish School Bd., 138 F.Supp. 336 (E.D.La.), dissolving three-judge court; 138 F.Supp. 337 (E.D.La.1956), aff'd, 242 F.2d 156 (5th Cir.), cert. denied, 354 U.S. 921, 77 S.Ct. 1380, 1 L.Ed.2d 1436 (1957); 163 F.Supp. 701 (E.D.La.), aff'd, 252 F.2d 253 (5th Cir.), cert. denied, 356 U.S. 969, 78 S.Ct. 1008, 2 L.Ed. 2d 1074 (1958), 268 F.2d 78 (5th Cir. 1959); 187 F.Supp. 42 (E.D.La.1960); aff'd, 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806 (1961); 188 F.Supp. 916 (E.D.La.1960), aff'd, 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806 (1961); 190 F.Supp. 861 (E.D.La.1960), aff'd, 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806 (1961); 191 F.Supp. 871 (E.D.La.), aff'd, 367 U.S. 908, 81 S.Ct. 1917, 6 L.Ed.2d 1249 (1961); 194 F.Supp. 182 (E.D.La.), aff'd, 367 U.S. 907, 81 S.Ct. 1926, 6 L.Ed.2d 1250 (1961); 204 F.Supp. 568 (E.D.La. 1962); new trial denied, 205 F.Supp. 893 (E.D.La.), modified, 308 F.2d 491 (5th Cir. 1962).

265. See Bynum v. Schiro, 219 F.Supp. 204 (E.D.La.1963).

266. See Fazzio Real Estate Co. v. Adams, 396 F.2d 146 (5th Cir. 1968); Robertson v. Johnston, 376 F.2d 43 (5th Cir. 1967); New Orleans City Park Improvement Ass'n v. Deteige, 252 F.2d 122 (5th Cir. 1958);

Barthe v. City of New Orleans, 219 F.Supp. 788 (E.D.La.1963); McCain v. Davis, 217 F.Supp. 661 (E.D.La.1963).

267. See Morrison v. Davis, 252 F.2d 102 (5th Cir.), cert. denied, 356 U.S. 968, 78 S.Ct. 1008, 2 L.Ed.2d 1075 (1958). See also United States v. Lassiter, 203 F.Supp. 20 (W.D.La.), aff'd, 371 U.S. 10, 83 S.Ct. 21, 9 L.Ed.2d 47 (1962).

268. This was established by uncontradicted evidence at trial.

269. See Tyler v. Harmon, 158 La. 439, 104 So. 200, 160 La. 943, 107 So. 704 (1925), rev'd, 273 U.S. 668, 47 S.Ct. 471, 71 L.Ed. 831 (1927); Land Dev. Co. v. City of New Orleans, 13 F.2d 898 (E.D.La.), rev'd, 17 F.2d 1016 (5th Cir. 1926). See also Modern Amusements, Inc. v. New Orleans Pub. Serv., Inc., 183 La. 898, 165 So. 137, 140 (1935); Queensborough Land Co. v. Cazeaux, 136 La. 724, 67 So. 641, L.R.A. 1916B 1201 (1915).

270. During the tenure of the present administration the number of black municipal employees has increased from 16% in May, 1967, to 39% as of June, 1973. Testimony presented by the City identified 10–15 black persons who hold key supervisory positions with the local government. Occupants of the three top positions in each of the 10–12 major city departments are appointed by the Mayor. The remaining supervisory jobs are civil service positions which are filled by selections from the top three successful candidates on the standard Civil Service examination.

Yet, looking at the city's payroll as a whole three things are evident. First, 16% representation in city employment of 45% of the population can indicate only the severity of pre-1967 discrimination against black .

juries.[271] We cannot remain insensitive to the cultural and economic realities which are the heritage of decades of abominable race relations in New Orleans.[272] Even more directly related to minority suffrage in New Orleans is Louisiana's traditional and "successful policy of denying Negro citizens the right to vote because of their race."[273] The grandfather clause,[274] the literacy standard,[275] the white primary[276] and the "Segregation Committee"[277] combined *inter sese* and with other techniques[278] to confine black political activity in Louisiana to a self-distressing level.[279]

We realize, of course, that judicial decisions[280] and the Voting Rights Act[281] have banished these obstacles to political functioning, and that race rela-

---

workers. Second, the number of black employees is still relatively small in comparison with the total municipal work force. Third, the pattern of employment reflects that blacks are, with limited exceptions, concentrated in low salaried maintenance and clerical positions.

271. Eubanks v. Louisiana, 356 U.S. 584, 78 S.Ct. 970, 2 L.Ed.2d 991 (1968); Goins v. Allgood, 391 F.2d 692 (5th Cir. 1968); Labat v. Bennett, 365 F.2d 698 (5th Cir. 1966).

272. Compare White v. Regester, *supra* note 145, 412 U.S. at 768–770, 93 S.Ct. 2332.

273. Louisiana v. United States, *supra* note 93, 380 U.S. at 147, 85 S.Ct. at 819.

274. See *id.* at 148, 85 S.Ct. 817. See also note 89, *supra,* and accompanying text.

275. An applicant for registration in Louisiana must "be able to read and write in the English language, or his mother tongue," La.Const. art. VIII, § 1(c) (1961), and must "demonstrate his ability to do so when he applies for registration. . . . " *Id.* The demonstration thus summoned entails each of the two exercises following. The first is "the reading and the writing from dictation given by the registrar, or an interpreter duly sworn, [of] any portion of the preamble of the Constitution of the United States of America. . . . " *Id.* The second is the "making, under oath, . . . [of a] written application for registration, in the English language, or his mother tongue. . . . " *Id.* The application must "contain the essential facts necessary to show that he is entitled to register and vote," *id.,* and must "be entirely written, dated and signed by him, except that he may date, fill out and sign," a prescribed form of application. *Id.* In either case, the application must be made "in the presence of the registration officer or his deputy, without assistance or supervision from any person or any memorandum whatever, other than the form of application. . . . " *Id.*
 The application form, decreed by statute, La.Rev.Stats.Ann. art. 18 § 32 (1966 supp.),

is comprehensive; understanding and completing it obviously demands a substantial degree of literacy; and false or illegal registration is punishable by fine and imprisonment. *Id.,* art 18, §§ 32, 222 (1966 supp.). An applicant unable to make application in English may do so in his mother tongue from the dictation of an interpreter, La. Const. art. VIII, § 1(c) (1961), and an applicant unable to write because of physical disability may dictate his application to the registration officer, *id.,* but all illiterate applicants apparently are barred from registration. See United States v. Louisiana, 225 F.Supp. 353, 357 n. 6 (E.D.La.1963), aff'd, 380 U.S. 145, 85 S.Ct. 817, 13 L.Ed.2d 709 (1965).
 In addition to those literacy exactions, Louisiana also requires that an applicant for registration "be able to understand and give a reasonable interpretation of any section of [the United States and Louisiana] Constitution[s] when read to him by the registrar. . . . " La.Const. art. VIII, § 1(d) (1961). It seems that as late as 1965 the interpretation test had not been employed in New Orleans, United States v. Louisiana, *supra,* 225 F.Supp. at 381, and the record is silent as to whether since then it has been used there. We note also that applicants for registration must "understand the duties and obligations of citizenship under a republican form of government," *id.* art. VIII §§ 1(c), (d), although again the role of the requirement in New Orleans voter registration is unclear.

276. See Louisiana v. United States, *supra* note 93, 380 U.S. at 148–149, 85 S.Ct. 817. See also note 90, *supra,* and accompanying text.

277. See *id.* at 149, 85 S.Ct. 817.

278. See *id.* at 149–150, 85 S.Ct. 817, 13 L. Ed.2d 709; United States v. Louisiana, *supra* note 275, 225 F.Supp. at 363–381.

279. See Part II(B), *supra.*

280. See cases cited *supra* notes 89–93.

281. See, for example, note 108, *supra.*

tions in the city have taken a turn for the better in recent years.[282] But neither of these wholesome developments negates the present significance of past racial discrimination. The debilitating effects of the old impediments persist and still hamper the black group's ability to function effectively in political processes.[283] The continuing handicap is mirrored in part by the fact that although black citizens in New Orleans approach a numerical majority, they remain a decided minority of registered voters.[284] As the Supreme Court has said, "[t]ests and devices [for voter registration] are relevant to voting discrimination because of their long history as a tool for perpetrating the evil; a low voting rate is pertinent for the obvious reason that widespread disenfranchisement must inevitably affect the number of actual voters."[285]

In assessing current afflictions of the plague of racial discrimination during yesteryears, a factor of undeniable importance is "the potential effect of unequal educational opportunities upon exercise of the franchise."[286] Our concern in this regard is heightened by Louisiana's long adherence to a literacy test.[287] The relationship between educational inequality and literacy prerequisites to voting is well understood,[288] and empirical data on black and white voter registration when the test held sway in New Orleans unmasks a discrepancy too glaring to ignore.[289] While the door has always been open, the City has come forward nothing to "demonstrate that although its schools suffered from the inequality inherent in any segregated system,[290] . . . the dual educational system had no appreciable discriminatory effect on the ability of persons of voting age to meet a literacy requirement."[291] In this case, the translation persuaded by the registration data is that the inferiority of black public schools has interacted with the literacy standard to exact a dreadful toll of would-be black registrants, to which the city's subpar black-voter strength stands even today as a monument.

Another factor denoting a minority's unequal access to political processes is its consistent inability to elect candidates to office.[292] Never has a black candidate won election to the New Orle-

282. See, for example, notes 65, 270, *supra.*

283. Turner v. McKeithen, *supra* note 145, 490 F.2d at 194; Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1306. See also Gaston County v. United States, *supra* note 111, 395 U.S. at 296–297, 89 S.Ct. 1720.

284. Compare Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1306.

285. South Carolina v. Katzenbach, *supra* note 86, 383 U.S. at 330, 86 S.Ct. at 819. See to the same effect, Gaston County v. United States *supra* note 111, 395 U.S. at 292, 89 S.Ct. 1720.

286. Gaston County v. United States *supra* note 111, 395 U.S. at 289, 89 S.Ct. at 1722. The literacy requirement in that case was that the applicant for registration "be able to read and write any section of the [North Carolina] Constitution in the English language." *Id.* at 287 n. 3, 89 S.Ct. at 1721. The Louisiana literacy standard, see note 275, *supra,* is surely no lower, and seemingly is even more demanding.

287. See note 275, *supra.*

288. See S.Rep.No.162, 89th Cong., 1st Sess. 16 (1965); H.R.Rep.No.439, 89th Cong., 1st Sess. 15 (1965), U.S.Code Cong. & Admin. News 1965, p. 2437; Gaston County v. United States, *supra* note 111, 395 U.S. at 296–297, 89 S.Ct. 1720.

289. Pre-Act registration of white and black inhabitants of New Orleans of voting age in 1960 was 63.0% and 28.4% respectively. U.S. Comm'n on Civil Rights, *Political Participation,* 240–41 (1968). Post-Act registration of the two groups rose less than 8 points to 67.7% for white citizens but nearly 20 points to 48.0% for black citizens as early as October, 1967. *Id.*

290. "Separate educational facilities are inherently unequal." Brown v. Board of Educ., 347 U.S. 483, 495, 74 S.Ct. 686, 692, 98 L. Ed. 873 (1964).

291. Gaston County v. United States, *supra* note 111, 395 U.S. at 291, 89 S.Ct. at 1723.

292. White v. Regester, *supra* note 145, 412 U.S. at 766–767, 93 S.Ct. 2332; Turner v. McKeithen, *supra* note 145, 490 F.2d at 195; Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305–1306.

ans City Council. The evidence establishes that four black candidates have recently been elected to other offices,[293] but we do not regard their victories as truly significant to the problem under discussion. One was unopposed; the others ran on tickets strongly backed by well known white personalities.[294] Furthermore, when the history of black candidacy in New Orleans is viewed as a whole, these triumphs represent no more than nominal success.[295] We cannot assign to them much weight in the equation.

Still another factor indicating unequal access is "the unresponsiveness of legislators to [the] particularized interests" of the minority.[296] We have chronicled instances of indifference of city officials to the desires and needs of the black citizens they purported to represent.[297] We may add that "[t]he parish's long history of segregation and voter registration discrimination certainly was a relevant evidentiary factor on the likely degree of concern by local officials for the interests of the black community."[298]

We do not say that all New Orleans legislators have been totally unresponsive; the evidence suggests sympathetic responses to some pleas of black constituents, but relatively speaking they were few. And we agree with the Fifth Circuit that "[w]ere we to hold that the absence of a claim of representation unresponsive to a minority's needs foreclosed constitutional attack, the voting strength of minorities could be freely diluted without fear of constitutional restraint."[299]

Lastly, in appraising black opportunity to engage in the city's political processes, we remain advertent to two structural features of the electoral scheme which exert a devitalizing effect. One is the requirement of a majority vote as a prerequisite to nomination as a candidate for public office,[300] a precondition sharply criticized for its propensity for submerging racial and political minorities.[301] The other is the legislative ban on singleshot voting,[302] which forecloses concentration of the minority vote on a single aspirant in primary

293. See note 69, *supra*, and accompanying text.

294. See notes 66–69, *supra*.

295. Moreover, like the Fifth Circuit,

we cannot endorse the view that the success of black candidates at the polls necessarily forecloses the possibility of dilution of the black vote. Such success might, on occasion, be attributable to the work of politicians, who, apprehending that the support of a black candidate would be politically expedient, campaigned to insure his election. Or such success might be attributable to political support motivated by different considerations— namely that election of a black candidate will thwart successful challenges to electoral schemes on dilution grounds. In either situation, a candidate could be elected despite the relative political backwardness of black residents in the electoral district. Were we to hold that a minority candidate's success at the polls is conclusive proof of a minority group's access to the political process, we would merely be inviting attempts to circumvent the Constitution. This we choose not to do. Instead, we shall continue to require an independent consideration of the record.

Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1307.

296. *Id.* at 1305. See also *id.* at 1306; White v. Regester, *supra* note 145, 412 U.S. at 766–769, 93 S.Ct. 2332; Turner v. McKeithen, *supra* note 145, 490 F.2d at 194, 195.

297. See text *supra* at note 71.

298. Turner v. McKeithen, *supra* note 145, 490 F.2d at 195 n. 18.

299. Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1306–1307 n. 26. See also Turner v. McKeithen, *supra* note 145, 490 F.2d at 195.

300. See Part I(A), *supra*. Compare White v. Regester, *supra* note 145, 412 U.S. at 766, 93 S.Ct. 2332; Turner v. McKeithen, *supra* note 145, 490 F.2d at 194, 196; Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305, 1306.

301. See Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1306; Graves v. Barnes, 343 F.Supp. 704, 725 (W.D.Tex.1972), aff'd sub nom. White v. Regester, *supra* note 145; Evers v. State Bd. of Election Comm'rs, 327 F.Supp. 640, 643 (S.D.Miss.1971).

302. See note 164, *supra*, and Part I(A), *supra*.

elections. These features of the electoral system have "enhanced the opportunity for racial discrimination,"[303] and clearly they continue to do so today.

New Orleans has offered no justification for these consequences apart from the considerations we have already discussed and found lacking.[304] We have pointed out that the City had the burden of demonstrating some compelling governmental interest incapable of fulfillment through any available alternative,[305] and that the City has not carried this burden.[306] It follows that no more in its impact upon potential than upon present black voting strength [307] can the proposed redistricting be approved.

## VIII. THE AT-LARGE ELECTIONS

### A. *The At-Large Problem*

Twice already, in particular contexts, we have attributed significance to the circumstance that New Orleans' proposed redistricting Plan II would leave two seats on the City Council to be filled by at-large elections,[308] as under the city's electoral scheme they now are.[309] No treatment of that facet of the city's electoral system could ignore the fact that with respect to the at-large seats, New Orleans is like any other multi-member elective unit,[310] and is susceptible to visitation by a special kind of abridgment problem which has arisen in other multimember units.[311] The question now confronting us is whether, apart from the vices already discussed, Plan II suffers from that additional difficulty.

In considering whether the plan, in constructing five singlemember districts with decided black-voter minorities in four, we counted the two at-large seats on the City Council for purposes of ascertaining whether and to what extent the present strength of the city's black vote for councilmen would be weakened.[312] And in determining whether the plan would diminish the black-vote potential endowed by a large black population, we similarly included the at-large seats in the computation.[313] In each instance we accepted the obvious fact that on an at-large basis the black voters of New Orleans were a minority, and for purposes of measuring dilution we took the two at-large seats for what they are —the expectancy of the white vote.[314] This treatment of the at-large seats contributed to our conclusions that, examined from the standpoint of either its current or its potential level, black voting power for city councilmen would be disparaged by the redistricting projected.

The problem we now address is different. It is whether, aside from these consequences, the redistricting plan and at-large voting combine in any other way to enfeeble the black vote in councilmanic elections. The issue is raised by the intervenors, who insist that the combination has further effects.

### B. *Jurisdiction to Consider*

We are met at the threshold by the City's charge that that issue is not properly in this case. As they state, the at-large election has been the vehicle for

303. White v. Regester, *supra* note 145, 412 U.S. at 766, 93 S.Ct. at 2340.

304. See Part VI(B), *supra*.

305. See Part VI(B), *supra*.

306. See Part VI(B), *supra*.

307. See Part VI(B), *supra*.

308. See text *infra* at notes 312–14.

309. New Orleans, La., Charter art. III, § 3–102 (1954).

310. "[M]ultimember districts—. . . in logic of analysis are merely one form of at-

large voting." Turner v. McKeithen, *supra* note 145, 490 F.2d at 194 n. 8, quoting Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1315 (Clark, J., dissenting). See also Zimmer v. McKeithen, *supra* note 145. 485 F.2d at 1304.

311. See note 254, *supra*.

312. See Part VI(A), *supra*.

313. See Part VII(C), *supra*.

314. See Parts VI(A), VII(C), *supra*.

filling two councilmanic seats since 1954,[315] and the redistricting plan would provide nothing different in that regard. Since Section 5 only intercepts changes in voting procedures occurring since November 1, 1964,[316] and since this court's concern is statutorily limited to an application of Section 5,[317] the City argues that any additional at-large election problem is beyond the ambit of Section 5 [318] and, by the same token, has no place in this litigation.

 We think, however, that the issue tendered by the intervenors is properly and unavoidably before us. The impact of New Orleans' redistricting plan is not to be determined in a vacuum, nor on the basis of just some of the facts, but in the context of all circumstances touching the right to vote in councilmanic elections. The plan, if approved, would become a part of the machinery for electing the City Council, and would be instrumental in the choice of five of its members. Another part of the machinery is the at-large election for the two remaining members of the Council. The interrelationship of these two parts is as relevant as any other circumstance bearing on the effect which the plan will have. The Council is a seven-member—not a five-member—body, and at-large voting for two of its members is an important aspect of the backdrop against which operation of the plan must be viewed. If at-large voting and the redistricting plan contribute together to diminish the strength of the black vote in more ways than one, it is our responsibility to say so.

At-large voting, we have held, does make one such contribution because it puts two of the seven Council seats beyond the reach of the black vote.[319] It does so, we said, because the black vote is distinctly a minority vote at an at-large election;[320] and the redistricting plan, we continued, completes its devitalization to an impermissible degree.[321] The intervenors assert that for yet another reason the at-large feature of councilmanic elections is a causative factor in black-vote dilution. Their position is that that very feature—of itself, without assistance from any other factor —minimizes the black vote for the two at-large seats because, they say, black voters have been denied a meaningful role in the political activities which lead to nomination and election of the two at-large councilmen.

If that position be correct, the involvement of Section 5 becomes plain, for any weakening of the black vote for those two councilmen obviously reduces the strength of the black vote in regard to membership on the Council as a whole. And any depreciation of the right to vote which ensues from that quarter obviously has a debilitating effect upon any black voting power which the redistricting plan permits. The plan, to merit judicial approbation, must survive not only the restrictions on black voting which it alone imposes but also those which jointly with extrinsic phenomena it makes possible. We conclude that the intervenors' contention must be entertained as a legitimate part of the investigation enjoined upon us by Section 5.

## C. Resolution of the Problem

 In examining the intervenors' claim, we start from the premise that "multimember districts are not *per se* unconstitutional, nor are they necessarily unconstitutional when used in combination with single-member districts.

---

315. New Orleans, La., Charter art. III, § 3–102 (1954).

316. See Part III(C), *supra*.

317. Beer v. United States, *supra* note 6, 374 F.Supp., at 360–362.

318. See Georgia v. United States, *supra* note 119, 411 U.S. at 535 n. 7, 93 S.Ct. 1702;

Perkins v. Matthews, *supra* note 105, 400 U.S. at 394–395, 91 S.Ct. 431.

319. See Parts VI(A), VII(C), *supra*.

320. See Parts VI(A), VII(C), *supra*.

321. See Parts VI(A), VII(C), *supra*.

. . . ."[322] It bears repeating, however, that multimember districts cannot be "used invidiously to cancel out or minimize the voting strength of racial groups,"[323] and that such districts succumb to the Constitution when it appears "that the political processes leading to nomination and election were not equally open to participation by the group in question. . . ."[324] We agree that an allegation of minority-vote dilution is unavailing "[w]here it is apparent that [the] minority is afforded the opportunity to participate in the slating of candidates to represent its area, that the representatives slated and elected provide representation responsive to minority's needs, and that the use of a multi-member districting scheme is rooted in a strong state policy divorced from the maintenance of racial discrimination. . . ."[325] But we also agree that a strong case of enervation emerges where a "state policy favoring multi-member or at-large districting schemes is rooted in racial discrimination,"[326] or "where a minority can demonstrate a lack of access to the process of slating

candidates, the unresponsiveness of legislators to their particularized interests, a tenuous state policy underlying the preference for multi-member or at-large districting, or that the existence of past discrimination in general precludes the effective participation in the election system. . . ."[327] And we further agree that "[s]uch proof is enhanced by a showing of the existence of . . . majority vote requirements [and] anti-single shot voting provisions. . . ."[328]

■ The constitutional validity of a multimember district, in terms of its impact upon the voting strength of minority groups within its borders, depends upon a balance of a variety of relevant circumstances.[329] They are, as previously noted,[330] the same factors which we have already had occasion to consider.[331] To summarize briefly, they include past discrimination foreclosing present effect participation by the minority in political processes,[332] past inability of the minority to elect candidates,[333] apathy of legislators toward the wishes and wants of the minority community,[334] majority

322. White v. Regester, *supra* note 145, 412 U.S. at 765, 93 S.Ct. at 2339. See also Turner v. McKeithen, *supra* note 145, 490 F.2d at 196 n. 23; Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1304.

323. White v. Regester, *supra* note 145, 412 U.S. at 765, 93 S.Ct. at 2339. See also Turner v. McKeithen, *supra* note 145, 490 F.2d at 197; Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1304.

324. White v. Regester, *supra* note 145, 412 U.S. at 766, 93 S.Ct. at 2339. See also Turner v. McKeithen, *supra* note 145, 490 F.2d at 196–197; Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305.

325. Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305. See also Whitcomb v. Chavis, *supra* note 145, 403 U.S. at 149, 91 S.Ct. 1858; Burns v. Richardson, *supra* note 145, 384 U.S. at 95–96, 86 S.Ct. 1286; Fortson v. Dorsey, *supra* note 145, 379 U.S. at 439, 85 S.Ct. 498; Turner v. McKeithen, *supra* note 145, 490 F.2d at 195.

326. Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305.

327. Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305. See also Turner v. McKeithen, *supra* note 145, 490 F.2d at 193–194.

328. Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305. See also Turner v. McKeithen, *supra* note 145, 490 F.2d at 194.

329. White v. Regester, *supra* note 145, 412 U.S. at 766, 93 S.Ct. 2332; Turner v. McKeithen, *supra* note 145, 490 F.2d at 194; Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305.

330. See note 254, *supra*.

331. See Part III(C), *supra*.

332. White v. Regester, *supra* note 145, 412 U.S. at 766, 768–770, 93 S.Ct. 2332; Turner v. McKeithen, *supra* note 145, 490 F.2d at 194, 195; Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305.

333. See text *supra* at notes 293–95. Compare White v. Regester, *supra* note 145, 412 U.S. at 766–767, 93 S.Ct. 2332; Turner v. McKeithen, *supra* note 145, 490 F.2d at 195; Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305–1306.

334. Compare Turner v. McKeithen, *supra* note 145, 490 F.2d at 194, 195; Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305.

vote requirements,[335] and anti-singleshot prohibitions.[336] We have found that all of these have worked to the serious detriment of the black vote in New Orleans.[337]

█ Truly it has been said that "where a state or political subdivision attempts to employ multi-member districts in the wake of history of pervasive racial discrimination, extreme care must be used in order to protect against the potential for dilution."[338] That admonition has not been heeded in this case. We have examined and weighed the pertinent factors in another context and found that they deprive the black community in New Orleans of equal opportunity to participate in the political processes by which members of the City Council are nominated and elected.[339] To the earlier discussions we need only add here that the City has not supported the choice of at-large elections by any consideration which would satisfy the standard of compelling governmental interest,[340] or the need to demonstrate the improbability of its realization through the use of single-member districts.[341] These evaluations compel the conclusion that the feature of the city's electoral scheme by which two councilmen are selected at large has the effect of impermissibly minimizing the vote of its black citizens;[342] and the further conclusion that for this additional reason the city's redistricting plan does not pass muster.[343]

## IX. DISPOSITION

All approaches to the redistricting problem in the City of New Orleans[344] converge at the same point. The plan tendered by the City will inexorably have the effect of abridging the right to vote in councilmanic elections on account of race or color.[345] We so decide, and that our judgment will abide.[346] And, exhausting our function by that adjudication,[347] the action will be dismissed. It goes without saying that, in consequence, the plan will remain under the continuing restraint of Section 5.[348]

335. See text *supra* at note 299. Compare White v. Regester, *supra* note 145, 412 U.S. at 766, 93 S.Ct. 2332; Turner v. McKeithen, *supra* note 145, 490 F.2d at 194, 196; Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305.

336. See text *supra* at note 301. Compare Turner v. McKeithen, *supra* note 145, 490 F.2d at 194; Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305.

337. See Part VII(C), *supra*.

338. Turner v. McKeithen, *supra* note 145, 490 F.2d at 196 n. 23.

339. See Part VII(C), *supra*.

340. See Part VI(B), *supra*. Compare Turner v. McKeithen, *supra* note 145, 490 F.2d

at 194, 195, 196 n. 23; Zimmer v. McKeithen, *supra* note 145, 485 F.2d at 1305.

341. See Part VI(B), *supra*. Compare Turner v. McKeithen, *supra* note 145, 490 F.2d at 196 n. 23.

342. See the cases cited *supra* note 322.

343. See Part VIII(B), *supra*.

344. See Parts VI–VIII, *supra*.

345. See Parts VI(A), (B), VII(C), VIII(C), *supra*.

346. See note 19, *supra*.

347. See Beer v. United States, *supra* note 6, 374 F.Supp. at 360–362.

348. See *id.* at 361–362; and note 19, *supra*.